### In re Robert W. FOSTER, Debtor.

**Stewart F. Grossman, as he is Chapter 7 Trustee, Plaintiff,**

v.

**Robert W. Foster, Defendant.**

**Bankruptcy No. 01–17541–RS.**
**Adversary No. 03–1440.**

United States Bankruptcy Court,
D. Massachusetts.

May 24, 2006.

Mark W. Bartolomei, Framingham, MA, for Debtor.

## MEMORANDUM OF DECISION

ROBERT SOMMA, Bankruptcy Judge.

By his complaint in this adversary proceeding, the chapter 7 Trustee, Stewart F. Grossman ("the Trustee"), seeks revocation of the Debtor's chapter 7 discharge. The complaint seeks revocation under 11 U.S.C. § 727(d)(2), on the basis that the Debtor became entitled to acquire, and did acquire, property of the estate—specifically, the proceeds of a prepetition promissory note—and knowingly and fraudulently failed to deliver and report the acquisition of such property to the Trustee. The Debtor, Robert W. Foster, while conceding that he did acquire the property in question, that it was property of the estate, and that he failed to report or deliver it to the Trustee, denies that his failure to report and deliver the property was knowing and fraudulent. After trial, and on the basis of the findings and ruling set forth below, the Court now holds that the Debtor acted knowingly and fraudulently and, accordingly, that his discharge must be revoked.

### Procedural History

On September 27, 2001, Robert W. Foster filed a voluntary petition under Chapter 7 of the Bankruptcy Code, thereby commencing this bankruptcy case. The United States Trustee appointed Stewart F. Grossman to serve as Chapter 7 trustee in the case, and Mr. Grossman continues to serve in that position. No objection to discharge having been filed by the deadline for doing so, the Court entered a discharge in favor of the Debtor pursuant to § 727(a) of the Bankruptcy Code on April 8, 2002.

On October 21, 2003, the Chapter 7 Trustee commenced the present adversary proceeding against the Debtor. The complaint seeks an order under 11 U.S.C. § 727(d)(2) revoking the Debtor's discharge. The basis of the complaint is that in June, 2002, the Debtor became entitled to acquire, and did acquire, certain property of the estate and knowingly and fraudulently failed to deliver and report the acquisition of such property to the Trustee. The property in question was a payment in the gross amount of $29,419.19, which constituted proceeds of a promissory note that the Debtor owned at the time of the bankruptcy filing.[1]

The Debtor filed an answer and then, with the Trustee, a Joint Pretrial Memorandum. The admissions set forth in the answer and in the Joint Pretrial Memorandum establish most of the operative facts and elements of the Trustee's case: that the Debtor became entitled to acquire, and did acquire, the payment in question; that the payment constituted proceeds of an asset, the promissory note, that he owned at the time of his bankruptcy filing; that he failed to report to the Trustee that he had become entitled to acquire, and did acquire, the payment; and that he failed to

---

1. The promissory note had been given him as consideration for the sale of certain undeveloped real property known as Lot 247 Rumford Road, Norton, Massachusetts.

deliver the payment to the Trustee. However, the Debtor denied that his failures to report and deliver to the Trustee were committed knowingly and fraudulently. He asserted as "affirmative defenses" (1) that he had "explained all the pertinent information regarding Lot 247 Rumford Road, Norton, Massachusetts to his then bankruptcy counsel before filing his Chapter 7 bankruptcy petition," (2) that any errors or omissions on his bankruptcy schedules were caused by his prior bankruptcy counsel, who both failed to advise the Debtor and failed to include, on his Schedule B, the necessary information as to the prior sale of Lot 247 Rumford Road, and (3) that at the time of his bankruptcy filing, he had no funds from the sale of Lot 247 Rumford Road and no understanding from prior counsel that the mortgage and/or promissory note should have been included as items of the Chapter 7 estate.

On August 17, 2006, the Court held a trial on the matter at which the Debtor was the only witness. The Court also received into evidence the deposition testimony of Debtor's former bankruptcy counsel, Attorney Mark W. Bartolomei, and the exhibits thereto.

### Findings of Fact

In late 1999 or early 2000, the Debtor determined that he wanted to file a petition for bankruptcy relief and, to that end, began meeting with Attorney Mark W. Bartolomei to assist him in filing the petition and related documents and to represent him in the bankruptcy case. At that time, he owned certain undeveloped real property known as and located at Lot 247 Rumford Road, Norton, Massachusetts ("Lot 247").

On or about May 11, 2001, the Debtor sold Lot 247 to Tribou Realty Corporation ("Tribou") for $35,700.00. At the same time, and as partial payment of this sum, Tribou gave the Debtor a promissory note (the "Note") in the principal amount of $29,419.19, together with a mortgage on Lot 247 to secure the promissory note ("the Mortgage"). By the terms of the Note, the principal amount thereof was payable "on or before 30 days after receipt of all permits and approvals required with respect to the collateral securing this note," i.e., Lot 247.[2] The Note also provided that, commencing June 11, 2001, Tribou would make monthly payments of interest to the Debtor in the amount of $250.00 until the Note was paid in full. And Tribou did make interest payments in the amount of $250.00 to the Debtor in each of June, July, and August, 2001.[3]

On September 26, 2001, the Debtor executed a document, entitled Assignment of Mortgage, purporting to assign the Mortgage and the promissory note to Easton Cooperative Bank (the "Bank") as additional collateral for amounts the Debtor already owed the Bank.[4]

The next day, on September 27, 2001, the Debtor filed a Voluntary Petition under Chapter 7 of Title 11 of the United

---

2. Promissory Note, Plaintiff's Exhibit 2, first paragraph.

3. The Court has no evidence as to whether Tribou made interest payments after this date.

4. The parties have stipulated that "the Debtor did not, at that time or at any other time, execute any document purporting to assign the Note," but their stipulation of fact is at odds with the Assignment of Mortgage itself, which expressly states that "Robert Foster, holder of a certain Mortgage ... assigns the said Mortgage, *the Note secured thereby,* and all rights accrued or to accrue thereunder to Easton Cooperative Bank." Assignment of Mortgage, Plaintiff's Exhibit 4 (emphasis added). I make no ruling on the effectiveness of the assignment of either the note or the mortgage, but I do find that the Debtor at least purported to make a collateral assignment as to both.

States Code (the "Bankruptcy Code"), thereby commencing this bankruptcy case. The petition was filed for the Debtor by Attorney Bartolomei and was a "skeleton" filing, a filing of the petition without the supporting Schedules A through J and the Statement of Financial Affairs ("SFA"). The Court ordered the Debtor to file these by October 12, 2001.

He signed the Schedules and SFA under penalty of perjury on October 11 and filed them on October 12, 2001. In the Schedules and SFA, the Debtor made no mention of the sale of Lot 247, of his interest in the Note and Mortgage, and of his receipt of interest income from the Note in the months before his bankruptcy filing. The Debtor knew of these omissions; they were not inadvertent. The SFA, at item 2, called upon the Debtor to state the amount of income he received other than from employment, trade, profession, or operation of a business within two years immediately preceding commencement of the case; here the Debtor should have listed the interest paid on the Note, but he answered "none." The SFA, at item 10, called upon the Debtor to "list all property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within one year immediately preceding the commencement of the case." Here the Debtor should have listed both his transfer of Lot 247 and his collateral assignment of the Note and Mortgage, but again he answered "none." Schedule B, the schedule of personal property, required the Debtor to disclose "accounts receivable" (item 15), "other liquidated debts owing debtor" (item 17), "other contingent and unliquidated claims of every nature," with estimated value of each (item 19), and "other personal property of any kind not already listed" (item 33). The Debtor should have listed the Note and Mortgage in response to one

or more of these items; instead, in each instance, he answered "none." Schedule D, the schedule of creditors holding secured claims, required the Debtor to list, for each secured claim, a description and the market value of the property subject to the creditor's lien. The Debtor listed the secured claim of Easton Cooperative Bank but did not disclose the Note and Mortgage as collateral for that debt.

On April 8, 2002, the Debtor received a discharge under § 727(a) of the Bankruptcy Code. His Chapter 7 case nonetheless remained open after this date because the Trustee was administering assets. The case has never been closed.

In June 2002, the Debtor was told by an attorney Robert L. Reed, acting as attorney for Tribou, that Tribou had sold Lot 247, that $29,419.19 was available from the sale proceeds to pay the Note, and that Attorney Reed would be delivering the $29,419.19 to Easton Cooperative Bank. The Bank received such $29,419.19 from Attorney Reed. The Bank subsequently informed the Debtor that it would deduct $1,860.10 for "Foster legal fees due to Wynn and Wynn" from the $29,419.19 it received and would pay the $27,559.09 balance to the Debtor. The Debtor requested that such $27,559.09 be made payable to "Robert and Jacqueline Foster." He did not inform the Trustee that he had become entitled to receive either the gross amount of $29,419.19 or the net amount of $27,559.09. He disclosed nothing to the Trustee about his entitlement to proceeds of the Note.

On or about June 18, 2002, the Bank paid $27,559.09 to Robert and Jacqueline Foster. The $27,559.09 payment constituted proceeds of the Note, and the Debtor knew this. The Debtor did not disclose to the Trustee his receipt of the $27,559.09 payment; nor did he deliver to the Trustee

the $27,559.09 payment or any portion thereof.

The Debtor contends that he acted without fraudulent intent. He contends that he disclosed Lot 247 to his counsel and told counsel that he considered Lot 247 to have no value—he couldn't even give it away—and that counsel, Attorney Bartolomei, told him that, because the property had no value, he did not have to disclose it in his Schedules and SFA. He relied on counsel to complete these documents and, although he (the Debtor) did quickly review the Schedules and SFA before signing them, he relied in good faith on counsel's judgment as to the appropriate responses to each item. The Debtor was not trained in bankruptcy law and practice; like many debtors, he was inclined to defer to the expertise of his counsel as one who was so trained. Later, when he received payment on the Promissory Note, he did not realize that he was obliged to disclose or turn it over to the Trustee. He believed otherwise for two reasons: first, because Attorney Bartolomei had told him that Lot 247 did not have to be disclosed; and second, because his discharge having by then entered, he believed his bankruptcy case was over and that he had no further obligations in the matter. These are the Debtor's allegations.

The Court makes the following findings concerning these allegations and the issue of whether the Debtor, in failing to disclose and turnover the proceeds to the Trustee, acted knowingly and fraudulently.

The Debtor acquired Lot 247 around 1991 from one of his debtors as payment in kind. The lot consists of undeveloped land and includes wetlands. When, in late 1999, the Debtor began meeting with Attorney Bartolomei about filing a bankruptcy petition, he had been trying to sell Lot 247 without success. He himself had made efforts to develop it but had been unable to secure a necessary permit. Around 1997 he gave up and began trying to sell the property. He managed to enter into purchase and sale agreements as to the property more than once, but each agreement was contingent on obtaining the necessary permit, and the purchasers met with the same result as had the Debtor, so the deals fell through. Without a permit, no one was interested in buying. In order to avoid the tax burden of the property, the Debtor had considered giving it away, but no one would take it off his hands, whatever the price. As of the time of his first meeting with Attorney Bartolomei, the property was again under agreement, but the agreement was contingent on the purchaser's obtaining a permit. Later, despite two lengthy extensions, it too expired without fruition.

In one of his early meetings with Bartolomei, Bartolomei systematically asked the Debtor about his assets, category by category. In conjunction with real estate holdings, the Debtor disclosed Lot 247 to Bartolomei, related to him the information in the previous paragraph, and explained to him why he thought the property was worthless. Bartolomei asked what county the land was in. The Debtor told him it was in Bristol County. Bartolomei said, "Well, that will probably slip by" or "slide through," or words to that effect. He did not then or ever say that Lot 247 did not have to be disclosed. The Debtor conceded that, at the time, he thought that Bartolomei's response—the question about Bristol County and the remark that "it might slip by"—was a little peculiar.

At the time of the forgoing meeting between the Debtor and counsel, the Debtor still owned Lot 247. The Debtor sold it to Tribou much later, in May 2001, which was still approximately four months before the bankruptcy filing. Bartolomei did not

represent him in that transaction. The Debtor never informed Bartolomei that he had sold Lot 247 to Tribou, that he had taken back a promissory note and mortgage in the transaction, or that he had been receiving interest income of $250 per month from the promissory note for at least three months before the bankruptcy filing. Nor did he ever inform Bartolomei that, on the day before his bankruptcy filing, he had assigned the Note and Mortgage to Easton Cooperative Bank as additional collateral. When he prepared the Debtor's Schedules and SFA, Bartolomei was ignorant of these developments and had no reason to know of them, and the Debtor knew this.

The Debtor signed and filed his Schedules and SFA approximately two weeks after his bankruptcy filing. Bartolomei had prepared the Schedules and SFA for the Debtor, but he had done so, as the Debtor testified he understood, entirely on the basis of information that Debtor had given him.[5] After preparing the Schedules and SFA for the Debtor, Bartolomei mailed them to the Debtor with instructions to review them, make sure they were accurate, report any necessary changes, sign them, and send them back. As the Debtor testified, he "just perused it ... just glanced at it, and it looked OK, and I just signed it." Although he knew that Bartolomei had never received information as to the sale of Lot 247, the Debtor's receipt of the Promissory Note and Mortgage, and the Debtor's receipt of interest income on the Note, he did not ask Bartolomei to make changes of any kind. He knew in signing the Schedules and SFA

that nothing about Lot 247 or the Note and Mortgage had been disclosed therein.

When he later received the $27,559.09 proceeds of the Promissory Note, he knew that these funds were proceeds of an asset that he owned and that he had not disclosed.[6] He did not disclose his receipt of these funds to Bartolomei. Nor is there evidence that he consulted an attorney—Bartolomei or anyone else—about his obligations with respect to these proceeds.

When asked at trial whether he had felt, upon receipt of the proceeds, that he had an obligation to turn the proceeds over to the Trustee, he answered, "it didn't dawn on me ... I never thought of it." I do not believe this testimony. Nor do I believe the Debtor's testimony that he relied on the advice of counsel in deciding not to disclose Lot 247 in his Schedules and SFA.

By the Debtor's own testimony, Bartolomei did not advise the Debtor that he did not have to schedule the property. Rather, he advised the Debtor that he could probably get away with not listing it. The decision not to list the property was a considered decision, made after discussion with counsel. However cursorily the Debtor may have reviewed the Schedules and SFA before signing and filing them, he knew both that they did not mention Lot 247 and, from his reading of the schedules and from his prior discussions with Bartolomei, that they should have mentioned not only Lot 247 but also the Note and Mortgage. Their absence from the schedules is thoroughgoing. The Debtor cannot have read the schedules even cursorily without knowing that they called for mention of this property and the Note and Mortgage in several places.[7] In short, the

---

5. Trial Transcript, pp. 29 and 37.

6. Trial Transcript, p. 47.

7. His counsel argues that a lay debtor is easily confused by the language of the Schedules

and the SFA, but the Debtor offered no testimony as to any such confusion, much less as to specific language that may have occasioned such confusion.

Debtor did not rely on advice that Lot 247 did not need to be disclosed. He knew it needed to be disclosed, and he arranged with counsel not to disclose it. He may simply have followed counsel's lead in the matter, but in doing so, he was not ignorant of the requirement that the property be disclosed.

Nor was the decision based on a good faith belief that the property had no value. Where property truly has no value, there is simply no reason *not* to list it: failure to list it can only expose a debtor to possible denial or revocation of discharge and, because the asset is in fact worthless, cannot profit the debtor; listing worthless property, on the other hand, will likely result in the trustee's abandoning the property back to the debtor at the close of the case. The only reason not to list the property would have been the possibility that (a) the Debtor might be able to sell the property for value and (b) his failure to list it might escape detection. As of the filing date and the dates on which he signed and filed his Schedules and SFA, the Debtor himself had to have known that the property had (or might have) some value: he had in fact sold the property and received a promissory note in return; the Promissory Note was at the very least paying interest income of $250 per month; and Easton Cooperative Bank had asked for a collateral assignment of it. Therefore, the Debtor knew the Note had at least some value (the value of the stream of interest income); he believed it might be worth as much as the face value of the note; and he did not believe for certain that it had no value.

Later, when he learned that the Note would be paid in full, the Debtor could no longer believe that the Note had no value.

Had the Debtor's decision not to disclose Lot 247 and the Note and Mortgage been based on a good-faith belief that these were entirely worthless, then upon learning that the Note had value of nearly $30,000, he would immediately have realized that his original course of action was based on a false premise and that he now needed to bring the Note and its proceeds to the attention of the Trustee. His testimony that this obligation never dawned on him is simply not credible.

*Discussion*

■ As the party seeking revocation of discharge, the Trustee bears the burden of proof. *In re Yonikus,* 974 F.2d 901 (7th Cir.1992); see also FED. R. BANKR. P. 4005 (plaintiff bears burden of proving an objection to discharge). The standard of proof is a preponderance of the evidence. See *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (preponderance standard applies in civil actions where statute prescribes no heightened standard and no particularly important individual interest or right is at stake; a debtor's interest in a discharge in bankruptcy is not sufficient to require a heightened standard of proof).

■ The Trustee seeks to revoke the Debtor's discharge under § 727(d)(2) of the Bankruptcy Code. Section 727(d)(2) states that, upon request of the trustee, the Court shall revoke a discharge granted under § 727(a) if "the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee."[8] 11 U.S.C.

8. This operative language in this section of the Bankruptcy Code was not modified by the Bankruptcy Abuse Protection and Consumer Protection Act (BAPCPA) of 2005. In any event, this case was commenced long before

§ 727(d)(2). The elements of the Trustee's case may be divided into four parts: (1) that the debtor acquired or became entitled to acquire certain property; (2) the property in question was property of the bankruptcy estate (or would be upon its acquisition); (3) the debtor failed to report the acquisition of or entitlement to such property or to deliver or surrender such property to the trustee; and (4) in so failing to report or deliver or surrender the property, the Debtor acted knowingly and fraudulently.

■ The Debtor does not dispute parts (1), (2), and (3). In any event, I find that the Trustee has proven these elements. The Note and Mortgage were owned by the Debtor on the date of his bankruptcy filing and therefore were assets of his bankruptcy estate within the scope of § 541(a)(1) of the Bankruptcy Code. 11 U.S.C. § 541(a)(1) (subject to exceptions not applicable here, the bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case"). The proceeds of the Note were therefore proceeds of property of the estate and, as such, were themselves property of the estate. 11 U.S.C. § 541(a)(6) (the estate includes "proceeds . . . or profits of or from property of the estate"). After commencement of the case, the Debtor became entitled to acquire these proceeds and did in fact acquire them. Nonetheless, the Debtor failed to report his entitlement to and acquisition of the proceeds to the Trustee; and he failed to deliver or surrender the proceeds to the Trustee.

■ In addition to the foregoing elements, the Trustee must also prove that in so failing to report and deliver or surrender the proceeds to the Trustee, the Debtor acted both "knowingly and fraudulent-ly." I construe "knowingly" to require proof that the Debtor's failure was accompanied by knowledge that the property in question belonged to the estate and that he was obligated to report or surrender it to the Trustee (as the case may be). I construe "fraudulently" to require proof of specific intent to defraud the Trustee or the estate.

■ The Court finds that, in failing to report and deliver or surrender the proceeds to the Trustee, the Debtor acted both knowingly and fraudulently. At all relevant times, he understood that the proceeds were assets of the estate, and he knew that he was obligated to disclose and turn them over to the Trustee. His failure to do so was a knowing and intentional disregard of these obligations to the Trustee and the estate. He acted with intent to defraud the estate.

Accordingly, the Court concludes that the Trustee has carried his burden of proof. By separate judgment, the Debtor's discharge will be revoked.

BAPCPA's enactment and therefore would not be governed by changes it effected.