In re Bruce E. THUNBERG, Debtor.

Marc D. Wallick, Trustee, Plaintiff

v.

Bruce E. Thunberg, Defendant.

**Bankruptcy No. 00–12818.**
**Adversary No. 02–1026.**

United States Bankruptcy Court,
D. Rhode Island.

Aug. 28, 2009.

Christopher Lefebvre, Esq., Law Office of Claude Lefebvre & Sons, Pawtucket, RI, for Debtor/Defendant.

Andrew S. Richardson, Esq., Boyajian Harrington & Richardson, Providence, RI, for Plaintiff.

## AMENDED DECISION AND ORDER REVOKING DISCHARGE

ARTHUR N. VOTOLATO, Bankruptcy Judge.

Heard on the Trustee's § 727(d)(2) Complaint to revoke the discharge of Debtor/Defendant Bruce Thunberg. After trial, considering the testimony and the credibility of witnesses, the documentary evidence, the oral and written submissions, and based on the findings and conclusions discussed below, it is this Court's ruling that the Debtor's discharge should be and hereby is **REVOKED.**

### TRAVEL AND ISSUE(S)

On August 11, 2000, Bruce Thunberg filed a Chapter 7 bankruptcy case, Marc D. Wallick was appointed trustee, and with no objection(s) filed, the Debtor's discharge was entered administratively[1] on December 7, 2000. As a result of events that occurred during the pendency of the case, in April 2002, the Trustee commenced this adversary proceeding, alleging that the Debtor obtained property of the bankruptcy estate, and that he knowingly and fraudulently failed to report the acquisition of, or to timely deliver or surrender such property to the Trustee. See 11 U.S.C. § 727(d)(2). The property in question is cash, i.e., $30,000 received by the Debtor in November 2000, and $50,000 received in June 2001. As of the date of trial (June 17, 2008), the non-exempt funds received post-petition by the Debtor had been delivered to the Trustee. So, this dispute is not so much about assets disgorged by the Debtor after their discovery by the Trustee, as it is a tale of the Debtor's efforts to conceal estate assets, to use said property for personal reasons, and when confronted, to deny and shift the responsibility for his actions away from himself, notably to his own lawyer.

---

1. "In a chapter 7 case, on expiration of the time fixed for filing a complaint objecting to discharge, ..., the court shall forthwith grant the discharge...." Fed. R. Bankr.P. 4004(c)(1).

## BACKGROUND [2]

As of the date this case was filed, the Debtor was, and presumably still is, the beneficiary of a Family Court approved Property Settlement Agreement with his former wife (the Agreement), wherein the Debtor was to receive ten annual lump sum payments of $30,000, with $16,666 of each payment designated as alimony, and $13,333 as property settlement. The Debtor stated on Schedule B of his bankruptcy petition that the payments due under the Agreement were subject to liens of two creditors. Confirming the information in the Debtor's bankruptcy schedules, on November 9, 2000, Debtor's bankruptcy counsel, Peter Berman, Esq., advised the Trustee by letter that the property settlement proceeds were pledged to Farm Service Agency and First Pioneer Farm Credit, and that in the absence of a contrary court order, the Debtor intended to honor the security agreements and to pay down those debts as he received funds from his former wife. See Plaintiff's Ex. V. Curiously, no secured claims were listed on the Debtor's Schedule D.

In November 2000, per the Agreement, the Debtor received his regular $30,000 annual payment. He did not report this event to the Trustee, but instead, deposited the entire amount into a bank account designated as Saugatucket Associates, Inc. The Debtor is the sole shareholder, officer, and director of Saugatucket. In December 2000, the Debtor moved, under 11 U.S.C. § 522(d)(10)(D), to amend his Schedule C to claim an unlimited exemption as to alimony, and an $8,000 exemption, under 11 U.S.C. § 522(d)(5), in the property settlement portion of the payment. In January 2005, the Trustee's objection to the Debtor's claim of exemption

in alimony and property settlement payments was sustained, with the exception of the amount allowed as exempt under 11 U.S.C. § 522(d)(5).

The Trustee testified that "at the § 341 meeting he was told by either the Debtor or his counsel that the alimony payments received from the Debtor's ex-wife were going to be paid to secured creditors." The Debtor's version is that he informed his attorney that he did not intend to pay the entire $30,000 to the banks, that he did not tell the Trustee about this, and doesn't know if his attorney passed that information on to the Trustee.

In a November 9, 2000, letter to the Trustee (Ex. V), Debtor's counsel **wrote:**

"I just wanted to follow up on the information I gave you at the 341A meeting. It is the position of the Debtor that the property settlement agreement referenced in schedule B is subject to security interests of the Farm Service Agency and of First Pioneer Farm Credit. In the absence of a Court order to the contrary, the Debtor intends to continue honoring these security agreements and making payments to the secured creditors as the Debtor receives payment from his former spouse. You indicated in our discussion that you might challenge the validity of these security agreements. If you make a final determination to make such a challenge, I assume you will be filing appropriate litigation and which we will receive notice."

The Trustee complains that Exhibit V, together with the Debtor's schedules and the information he received at the Section 341 meeting, conveyed the message that the Debtor would remit the entire payment to

---

**2.** This opinion Constitutes our findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 7052 and Fed. R. Bankr.P. 9014.

the secured creditors. In fact, when he received the November 2000 payment, the Debtor kept the entire $30,000, failed to inform the Trustee about his intentions, and used the funds for purposes still unknown to the Trustee or creditors.

The Debtor testified and contends that Exhibit V spells out clearly that only the property settlement portion was to be paid to secured creditors, and that he "made the payments in accordance with the security agreement." Considered together with the entire record, I agree that Exhibit V is ambiguous, and intended to suggest that the entire payment would be forwarded to alleged *secured* creditors.[3]

The Debtor also testified that his attorney advised him "that he could use the alimony portion of the payments to live on," and Mr. Berman confirmed this. The Debtor's retention of the alimony portion of the payment was also based on the problematic reasoning that "the Trustee did not request them." None of this however, even if accepted as true, explains how the Debtor could reasonably have believed that he was authorized to retain the non-alimony portion of the payment.

In June 2001, in further disregard of his obligation to disclose and/or turn over estate property, the Debtor, without notice to either the Trustee or his own attorney, negotiated an agreement with his former wife that she would pay him $50,000 immediately (plus $4,000 at a later date), in exchange for $60,000 worth of future payments. The Debtor received the payment on June 28, 2001, and deposited the $50,000 into his personal checking account. On the same day he transferred: (1) $14,151.97 to the Saugatucket account; (2) $909 to First Pioneer Loan; (3) $8,099 to First Pioneer Farm Credit from the Saugatucket account; and (4) $16,901 from Twin Peaks Land and Cattle ("Twin Peaks") (a business account under his control), to First Pioneer Farm Credit. Also within the next few days, the Debtor made separate transfers of $15,000 and $5,000 from his personal account to the Twin Peaks account.

At about the same time as these transfers and payments were quietly[4] being made by the Debtor, the Trustee was investigating the alleged security agreements, and reviewing records at the Office of the Rhode Island Secretary of State. The result of this search is that the Trustee learned that neither Farm Services Agency nor First Pioneer Farm Credit were secured creditors, as represented by the Debtor and his counsel.

Having confirmed that the alimony/property settlement proceeds were not properly secured, the Trustee contacted Mr. Berman to protest, and on July 19, 2001, First Pioneer, which had already received and credited $25, 000 to the Debtor's loan account, reversed the payment and returned $23,287.60 to the Debtor. On the next day, the Debtor issued a check from his personal account and delivered it to Berman, who immediately forwarded $27,333 to the Trustee. Then, on August 8, 2001, Berman wrote to the Trustee (Plaintiff's Ex. S), again post facto, "to confirm the present status of payment which Mr. Thunberg has received … from his former spouse."

When confronted on cross examination as to his use of the $50,000, the Debtor's

---

3. This is not a dispositive issue, but is noteworthy mainly as it relates to the Debtor's credibility, which became less reliable the longer he remained a witness.

4. "Quietly" is used here in its most literal sense, as Mr. Thunberg was not even keeping his own lawyer informed about the negotiations, the compromise, the payment, or how he distributed the $50,000.

cavalier explanation was merely that he "was unaware" that the security interests to Farm Service Agency and First Pioneer Farm Credit were not perfected. The Debtor also testified on this subject that he remembers disclosing the agreement to his attorney before receiving the money, and also that "he thought his lawyer and the Trustee had discussed the pre-payment before it was done." Berman has no recollection of being told of the compromise and, if consulted, would not have approved it. Mr. Berman also testified that he did not learn of the compromise until the Trustee filed this adversary proceeding, and that he "was not happy about it." The Debtor's version of this episode is rejected as a fabrication.

Although he was not timely informed by his client of the compromise or the payment, Berman confirms that he drafted the August 8, 2001 letter (Ex. S), as well as discussing with the Trustee the receipt of an amount greater than the usual $30,000 payment. The letter references a December payment of $13,333, the non-alimony portion of a regular $30,000 annual payment, and a June payment of $22,000, which, coincidentally, corresponds to what would be the non-alimony part of a $50,000 payment.

The August 8, 2001, letter states:

I wanted to confirm the present status of payment which Mr. Thunberg has received post petition from his former spouse. Mr. Thunberg has received a total payment in this category of $35,333 consisting of a December payment in the sum of $13,333, and a June payment of $22,000. On July 24, 2001, I provided you with Mr. Thunberg's check in the sum of $27,333 which represented all funds which he has received from his former spouse minus the sum of $8,000

which I understand you agree is subject to his exemption under 11 USC 522(d)(5).[5]

Berman does not recall how he arrived at the $35,333 figure, he cannot tell us what he meant by the phrase "in this category," and his only independent memory on this subject is that "the Trustee had not expressed any interest in the alimony monies at that time." The Debtor testified that in his mind the letter was clear and not misleading. The Court disagrees with that assessment, which only suggests that the Debtor had managed to leave his own attorney as confused as was the Trustee, regarding his actions. This should not be a surprise, since, as the trial went on, it became progressively more evident that Mr. Thunberg was selectively withholding relevant information from his own attorney. For example, when he wrote to the Trustee on August 8, 2001, Berman was unaware that his client had received a total of $80,000 from his former wife, he knew nothing of his negotiations with her, the $54,000 compromise, the payment, or that his client was likely using estate property for his personal use.

■ Discrepancies between Thunberg's testimony and that of his bankruptcy attorney leave too many negative inferences for him to avoid the consequences of his post-petition misconduct, which in no way can be innocent mistakes. And although the Trustee was not sufficiently watchful of the Debtor during the administration of the case, this cannot lessen the Debtor's obligation to be straightforward with his lawyer, the Trustee, and his creditors. *See Boroff v. Tully (In re Tully),* 818 F.2d 106 (1st Cir.1987). In violation of said obligation, however, Mr. Thunberg: (1) remained silent as his attorney mistakenly

---

**5.** How or why the Trustee understood Exhibit S to represent that the Debtor had received just one payment, remains an irrelevant mystery to this Court.

and incorrectly represented to the Trustee that funds were being paid to secured creditors; (2) engaged in secret negotiations involving estate property; and (3) then hurriedly disbursed the proceeds of the unauthorized settlement, all without his lawyer's knowledge. This kind of deception is clearly within the scope and prohibition of § 727(d)(2). The Debtor has failed to rebut any of the inferences that reasonably must be drawn from such behavior.[6]

### DISCUSSION, FINDINGS AND CONCLUSIONS

Under 11 U.S.C. § 727(d)(2), a discharge may be revoked if the trustee establishes that "the debtor acquired property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee; . . ."

The standard and the guide for Section 727 litigation in this Circuit is set out in *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir.1987), where Judge Selya wrote:

> Under § 727(a)(4)(A), the debtor can be refused his discharge only if he (I) knowingly and fraudulently made a false oath, (ii) relating to a material fact. The burden of proof rests with the trustee, *In re Shebel*, 54 B.R. 199, 202 (Bankr. D.Vt.1985), but "once it reasonably appears that the oath is false, the burden falls upon the bankrupt to come forward with evidence that he has not committed the offense charged." *Matter of Mascolo*, 505 F.2d 274, 276 (1st Cir.1974).

The statute, by its very nature, invokes competing considerations. On the

one hand, bankruptcy is an essentially equitable remedy. As the Court has said, it is an "overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction." *Bank of Marin v. England*, 385 U.S. 99, 103, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966). In that vein, the statutory right to a discharge should ordinarily be construed liberally in favor of the debtor. *Matter of Vickers*, 577 F.2d 683, 687 (10th Cir. 1978); *In re Leichter*, 197 F.2d 955, 959 (3d Cir.1952), *cert. denied*, 344 U.S. 914, 73 S.Ct. 336, 97 L.Ed. 705 (1953); *Roberts v. W.P. Ford & Son, Inc.*, 169 F.2d 151, 152 (4th Cir.1948). "The reasons for denying a discharge to a bankrupt must be real and substantial, not merely technical and conjectural." *Dilworth v. Boothe*, 69 F.2d 621, 624 (5th Cir.1934).

On the other hand, the very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction. As we have stated, "the successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." *Mascolo*, 505 F.2d at 278. Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight. *See In re Tabibian*, 289 F.2d 793, 797 (2d Cir. 1961); *In re Shebel*, 54 B.R. at 202.

---

6. I do not see here a joint scheme by client and attorney, but rather, the Debtor's independent efforts to deceive the Trustee, notwithstanding that it required him to withhold information from, and to mislead his own attorney, as to what he was doing.

*Id.* I believe the Circuit Court's analysis and discussion of the issues in *Tully* addresses our facts very closely, and compels a similar result here.

■ The Trustee bears the burden of proof on both elements of § 727(d)(2), Fed. R. Bankr.P. 4005; *Grossman v. Foster (In re Foster)*, 343 B.R. 385, 392 (Bankr. D.Mass.2006); *Richardson v. McCullough (In re McCullough)*, 259 B.R. 509, 523 (Bankr.D.R.I.2001), by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). And to establish that an act was done "knowingly", the Trustee must show that "the Debtor's failure was accompanied by knowledge that the property in question belonged to the estate and that he was obligated to report or surrender it...." *Grossman*, 343 B.R. at 393. As to whether the Debtor acted "fraudulently," the Trustee must show "specific intent to defraud the Trustee or the estate." *Id.* Both in his post-petition conduct and at trial, this Debtor has repeatedly failed to provide truthful, reliable and complete information about his affairs, and based on the entire record, I find and conclude that Mr. Thunberg intended to hinder, delay or defraud his creditors.

The Debtor, I believe, attended every hearing and was provided with copies of every pleading and document filed by his attorney. Throughout, he was well-informed and fully involved, yet argues that any "mistakes" on his part were the result of innocent error, misstatements by, or bad advice by his counsel,[7] or that the Trustee didn't ask enough questions. While clients commonly tend to shift blame to their attorneys when things do not go well at trial, it was surprising to this Court when Thunberg offered, among other complaints, that his failure to turn over non-exempt funds "was a direct result of advice of counsel." (Doc. No. 95, Debtor/Defendant's Post–Trial Mem. of Law, at 10.) Quite to the contrary, I find that in this case Mr. Thunberg received ongoing professional legal service, cover, and loyalty that went far beyond what is required, and very rarely provided. In fact, I find Mr. Berman's protective efforts and advocacy to be excessive, as he repeatedly was doing risky damage control, and trying, after the fact, to absolve and explain away the Debtor's misconduct.

■ The fact that after sparring with the Trustee for seven years, the Debtor finally turned over the balance of what he owed the estate, does not alter the outcome here. Thunberg converted estate property to his own use in 2000 and 2001 and, "the eventual turnover of funds does not cure the original fraud." *Olsen v. Reese (In re Reese)*, 203 B.R. 425, 431–32 (Bankr.N.D.Ill.1997). After initially trying to conceal it, the Debtor failed to timely report the acquisition of such property, and he stubbornly held on to some of the funds until just prior to the commencement of the trial.

■ Another necessary element, "knowingly", includes the failure to timely deliver, with knowledge that the property was not his, and that, at a minimum, he was required to report its acquisition to the Trustee. I find that the Debtor knew that the manner in which he was withholding information would and did hinder and delay those to whom he is accountable. As for his failure to timely surrender estate property, the totality of the Debtor's post-petition conduct, i.e., his claims of innocence, in contrast with his overt actions and shifting blame to counsel, satisfies the Trustee's burden to show that the Debtor acted with the requisite intent to defraud.

---

7. See Debtor/Defendant's Post–Trial Mem. of Law, Doc. No. 95, at 5–8, and Debtor/Defendant's Reply to Trustee's Post–Trial Mem. of Law, Doc. No. 97, at 1–2.

To have any validity, both the Debtor's Post–Trial Memorandum of Law and his Reply to Trustee's Post–Trial Memorandum of Law would require one to presume that all of the Debtor's testimony is true and worthy of belief, whether disputed or uncontradicted. That would call for the kind of leap that this Court is not able or willing to make, and is illustrative of the nature of the problems confronting both of Mr. Thunberg's attorneys in this proceeding, i.e., the reality of what the Debtor was doing, versus the truth or falsity of what allegedly was in his mind. As the trier of the facts, the Court is in nearly total disagreement with the factual and conclusory assertions of Debtor's successor counsel.

Based on the entire record in this case, I find that the Trustee has satisfied his burden of proof as to both elements of 11 U.S.C. § 727(d)(2), and that after viewing the evidence cumulatively, the relief sought in the Trustee's Complaint is clearly warranted. Therefore, the Debtor's discharge is **REVOKED.**

Enter Judgment consistent with this opinion.