**IN RE: Mark Evan DAVIS and Jennifer Ann Davis, Debtors.**

**Daniel M. McDermott, Plaintiff,**

**v.**

**Mark Evan Davis, et al., Defendants.**

Case No. 13–55353
Adv. Pro. No. 14–2153

United States Bankruptcy Court,
S.D. Ohio, Eastern Division,
at **Columbus.**

Signed September 30, 2015

Luther J. Mills, Delaware, OH, for Debtor

*MEMORANDUM OPINION ON COM-PLAINT OF THE UNITED STATES TRUSTEE SEEKING REVOCA-TION OF THE DEBTORS' DIS-CHARGE*

John E. Hoffman, Jr., United States Bankruptcy Judge

## I. Introduction

The United States Trustee (the "UST") asks the Court to revoke the Chapter 7 discharge of Mark Evan Davis and Jennifer Ann Davis,[1] alleging that they knowingly and fraudulently failed to report the acquisition of property of the estate and deliver the property to the Chapter 7 trustee, Clyde Hardesty ("Hardesty"). But Mark in fact reported his entitlement to and acquisition of the property—an inheritance he received from his father—to Hardesty. And although the Debtors used a portion of the inherited funds to pay bills and meet their family's basic needs, the UST failed to carry his burden of proving that they did so with knowledge that the funds were property of Mark's bankruptcy estate or with any intent to defraud Hardesty. The Court accordingly denies the UST's request to revoke the Debtors' discharge.

---

1. For ease of reference, the Court will refer to the Davises individually by first name and

## II. Jurisdiction and Constitutional Authority

 The Court has jurisdiction to hear and determine this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(J). Because the issue of whether a discharge should be revoked "stems from the bankruptcy itself[,]" *Stern v. Marshall,* —— U.S. ——, 131 S.Ct. 2594, 2618, 180 L.Ed.2d 475 (2011), the Court also has the constitutional authority to enter a final order on the UST's request. *See Wan Ho Indus. Co. v. Hemken (In re Hemken),* 513 B.R. 344, 350 (Bankr.E.D.Wis.2014) ("The Court has the authority to enter a final order as these cases involve the Debtor's discharge, a matter which is ... at the center of the adjustment of the debtor-creditor relationship.").

## III. Procedural Background and Overview

On July 4, 2013 (the "Petition Date"), the Debtors filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code, and the UST appointed Hardesty as the Chapter 7 trustee in their bankruptcy case. Following the Court's entry of an order granting the Debtors a Chapter 7 discharge and the closing of their bankruptcy case, Mark became entitled to an inheritance of approximately $138,000 as a result of the death of his father, which occurred within 180 days after the Petition Date. Under the Bankruptcy Code, property of a debtor's bankruptcy estate includes "[a]ny interest in property that would have been property of the estate if such interest had been an interest of the

---

collectively as the "Debtors."

debtor on the date of the filing of the petition, and that the debtor acquires or becomes entitled to acquire within 180 days after such date ... by ... inheritance[.]" 11 U.S.C. § 541(a)(5)(A).

Although he delayed in doing so, Mark eventually informed his bankruptcy attorney, Stacy Mills ("Mills"), of his father's passing and asked her about the implications for the Debtors' bankruptcy case. Mills, however, took nearly two months to advise Mark that he was required to turn over the inheritance to Hardesty, and in the meantime Mark used the proceeds of three inheritance checks (in the approximate aggregate amount of $18,000) to pay bills and meet living expenses. After Mills advised him that the inheritance was property of his estate, Mark reported the inheritance—and the fact that he had already cashed or deposited three checks—to Hardesty, who filed a motion to reopen the Debtors' case to administer the inheritance as an asset of the bankruptcy estate. Doc. 17 at 2.[2] The Court entered an order reopening the case (Doc. 18), and the UST reappointed Hardesty as the trustee. Doc. 20.

Hardesty filed a motion for turnover of the inheritance, and about a week later the UST filed a Complaint (Adv.Doc. 1) seeking revocation of the Debtors' discharge

under 11 U.S.C. § 727(d)(2).[3] The Debtors and Hardesty filed various papers in the bankruptcy case relating to the inheritance, leading to a Court-approved settlement under which the Debtors were required to deliver to Hardesty—and did deliver to him—nearly $120,000 of the approximately $138,000 inheritance, with Hardesty agreeing to forbear from collecting the $18,000 the Debtors had already spent. Despite the settlement, the UST continued to seek the revocation of the Debtors' discharge, contending that they had knowingly and fraudulently failed to report the inheritance and deliver $18,000 of it to Hardesty. The transcript of the day-long trial on the Complaint is located at Adv. Doc. 24 ("Tr."). During the trial, Exhibits 1 through 9 offered by the UST and the Debtors' Exhibits A through I were admitted into evidence without objection. The Court heard the testimony of the Debtors, Hardesty and Mills.[4]

## IV. Findings of Fact

Based on the evidence presented at trial, including the documentary evidence and the testimony presented, and having considered the demeanor and credibility of the witnesses, the Court makes the findings of fact set forth below.

---

**2.** References to "Doc. ——" are to docket entries in the Debtors' bankruptcy case, Case No. 13–55353, and references to "Adv. Doc.——" are to docket entries in this adversary proceeding, Adversary Proceeding No. 14–2153.

**3.** Section 727(d)(2) of the Bankruptcy Code states:
 On request of the trustee, a creditor, or the United States trustee, and after notice and a hearing, the court shall revoke a discharge granted under subsection (a) of this section if—
 (2) the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of

the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee[.] 11 U.S.C. § 727(d)(2).

**4.** During the UST's deposition of the Debtors, they agreed to waive their attorney-client privilege as to Mills. UST Ex. 2 (Debtors' February 9, 2015 deposition) (the "Deposition") at 47. The Debtors were represented at trial by Laura Nesbitt, who filed a notice of substitution (Doc. 27) as bankruptcy counsel for the Debtors, and also by Myron Terlecky, who filed a notice of appearance in the adversary proceeding only.

### A. Events Leading to the Debtors' Bankruptcy

Before they were married in September 2002, each of the Debtors had separately incurred substantial student-loan debt. A few years after marrying, they consolidated the student loans that they had incurred at that time, making each of them jointly liable for the debt. Tr. at 221–22. Although they both were working as much as possible, the Debtors' financial situation was such that they had difficulty making payments on the debt—all the more so after they had one child and then another. But they did not ignore the debt, instead taking the steps necessary to place the student loans into deferment or forbearance status. Tr. at 222–23. Sometime after 2008, Mark incurred additional student-loan debt as his sole obligation. Tr. at 232–33.

The Debtors first considered filing a bankruptcy case about five years before the Petition Date. But they were aware that their student-loan debt would be nondischargeable in bankruptcy, Tr. at 222, and believed that it was not "right for [them] to go and have [their other debts] written off[,]" so they attempted to address their financial difficulties outside of bankruptcy. Tr. at 225. For example, in order to pay down their obligations, the Debtors withdrew more than $60,000 from their retirement accounts in 2011 and withdrew about $10,000 more from those accounts in order to pay debt in 2012 and early 2013. Tr. at 223–25; UST Ex. 1, Statement of Financial Affairs, Question 2. They drove vehicles that were 12 and 18 years old as of the Petition Date, lived in a house for which the mortgage payment was just slightly more than $1,000 and both worked, together earning approximately $4,800 in gross income per month. UST Ex. 1, Schedules B, I and J.

### B. The Commencement of the Debtors' Bankruptcy Case

On the Petition Date, the Debtors filed their schedules of assets and liabilities and Statement of Financial Affairs as required by § 521(a)(1)(B) of the Bankruptcy Code and Rule 1007(b)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rule(s)"). Despite the efforts undertaken by the Debtors to address their financial difficulties, on the Petition Date the Debtors still had $199,467.89 of unsecured, nonpriority debt, including more than $155,000 in student-loan debt.[5] UST Ex. 1, Schedule F—Creditors Holding Unsecured Non priority Claims. The Debtors identified on Schedule F which of their debts, including their student-loan debts, were joint debts and which were the sole obligations of either Mark or Jennifer.

### C. Events Occurring After the Petition Date But Before the Death of Mark's Father

After the Debtors commenced their bankruptcy case, the UST convened a meeting of their creditors under § 341 of the bankruptcy Code. During that meeting, Hardesty provided the Debtors with a one-page document entitled "Post 341 Responsibilities" (the "Trustee Handout") (UST Ex. 7). Among other things, the Trustee Handout advised the Debtors that they "must notify [Hardesty] immediately if, within 180 days after the [Petition Date], [they] become entitled to receive any money or property ... [b]y ... inheritance[,]" clarifying that "the decedent's

---

**5.** Student-loan debt is nondischargeable in bankruptcy except to the extent that the debtor files an adversary proceeding—which the Debtors have not filed—and demonstrates that excepting the debt from discharge "would impose an undue hardship on the debtor and the debtor's dependants[.]" 11 U.S.C. § 523(a)(8).

date of death is the date [they] become entitled to receive money or property from an estate[.]" The Debtors stipulated that they received and reviewed the Trustee Handout. Tr. at 111. In addition, around the time of the Petition Date, someone at Mills's law office gave Jennifer a "Bankruptcy Information Packet" informing the Debtors that "if [they] receive, or become entitled to receive, an inheritance ... while [their] case is pending or within six months of [their] Petition being filed, [they] must turn it over to the trustee." UST Ex. 6; Tr. at 43–45. Jennifer testified that she read this information, but did not know whether Mark had reviewed it. Tr. at 228–29, 233–35. Mark did not remember having read the Bankruptcy Information Packet. Tr. at 156, 183. In any event, at the time they received these documents the Debtors had no expectation that either of them would soon be receiving an inheritance. Tr. at 229.

The Trustee Handout informed the Debtors that their reporting "obligations [would continue to] exist, whether or not this case has been closed or [Hardesty] has filed a no-asset report," which is the document that Chapter 7 trustees file when debtors have insufficient non-exempt assets to fund distributions to unsecured creditors. The Debtors indeed had the responsibility to file a supplemental schedule reporting any inheritance covered by § 541(a)(5)(A) within 14 days after learning of it, a responsibility that continued even after Hardesty filed a no-asset report in the Debtors' case, even after they received their bankruptcy discharge in October 2013 and even after the Court closed their case in November 2013. *See* Fed. R. Bankr.P. 1007(h).[6]

## D. The Inheritance

When the Debtors received their Chapter 7 discharge on October 22, 2013, they still were not anticipating that either of them would be receiving an inheritance in the near future. Tr. at 235–36. But then, on November 27, 2013, Mark's father died unexpectedly, and several days later Mark learned that his father had provided for him in his will. On December 3, 2013—which just happened to be the day of the funeral for Mark's father, Tr. at 159—Mills e-mailed the Debtors to ask them to contact her office "to schedule [a] final appointment" at which she would "answer any question [they had] regarding the bankruptcy's affect [sic] for future financial transactions." UST Ex.3d at 1. Without specifying who had passed away, the Debtors informed Mills that they were out of state for a funeral, but would "be in touch when we return." *Id.*

Although it took Mark a couple of months to get back in touch with Mills, the delay was understandable. Mark testified that his father's death staggered him. According to Mark, the relationship between father and son had been strained for several years, and they had not made amends at the time his father died. Tr. at 159. Thus, in addition to experiencing the nor-

---

**6.** Bankruptcy Rule 1007(h) states:

If, as provided by § 541(a)(5) of the Code, the debtor acquires or becomes entitled to acquire any interest in property, the debtor shall within 14 days after the information comes to the debtor's knowledge or within such further time the court may allow, file a supplemental schedule in the chapter 7 liquidation case, chapter 11 reorganization case, chapter 12 family farmer's debt ad-justment case, or chapter 13 individual debt adjustment case. If any of the property required to be reported under this subdivision is claimed by the debtor as exempt, the debtor shall claim the exemptions in the supplemental schedule. The duty to file a supplemental schedule in accordance with this subdivision continues notwithstanding the closing of the case[.]

Fed. R. Bankr. P. 1007(h).

mal grief occasioned by the death of a parent, Mark felt significant remorse. Tr. at 159. Mark testified that he was "slipping into a real bad depression." Tr. at 160. "I was constantly in a fog and … I was just not myself." *Id.* Medical records dated two weeks after his father's passing corroborate Mark's condition at the time, noting his "grief reaction," as well as a "worsening of his depression and poor attention span, distractibility, difficulty sleeping, etc." Debtors' Ex. I. As a result of these conditions, Mark's doctor increased the dosage of his antidepressants and prescribed medication to help him sleep. Tr. at 160–61. Under the circumstances, the fact that Mark's thoughts did not turn to his bankruptcy case immediately after he learned of the inheritance in no way suggests that Mark intended to defraud the Chapter 7 trustee by failing to report it.

### E. Mark Reported the Inheritance to Hardesty.

On the contrary, although he failed to meet the 14–day deadline prescribed by Bankruptcy Rule 1007(h), Mark reported the inheritance to Hardesty. The process of his doing so started when Mark reached out to Mills with a question about the impact of his father's death on the Debtors' bankruptcy case. Mark's first step was consistent with Hardesty's direction in the Trustee Handout that the Debtors "should consult [their] attorney" with any questions about their obligations. During his testimony, Hardesty confirmed that debtors who have questions "should always call their attorney first[.]" Tr. at 136.

At some point in mid-January 2014— more than 180 days after the Petition Date—Mark received inheritance checks in the amounts of $943.52 and $3,465.86, both dated January 10, 2014. Mark still had those two checks in his possession when he received another check in the amount of $13,675.67 dated February 6, 2014. *See* Mark's timeline attached to the Deposition (the "Timeline") at 1; UST Ex.3d at 68–70. Mark had not cashed or deposited any of the three checks when, on February 9, 2014, he e-mailed Mills to inform her that his "father passed away at the end of November," stating that he "wasn't sure if that had an effect" and asking "[c]ould [Mills] please advise on this?" UST Ex.3d at 3. Mills responded to Mark's question by e-mail the next day, inquiring whether he had received or was "going to receive [an] inheritance" and telling him that she would "let [him] know if [his father's] passing will matter for [Mark's] bankruptcy." *Id.* That same day, February 10, 2014, Mark replied by e-mail, informing Mills that he was "50/50 with [his] brother[,]" that his father's "estate is set up and there have been a few checks that have rolled through," but that Mark had not "cashed them … at this time for fear of it messing up the bankruptcy." *Id.* at 4.

As described below, it took Mills approximately two months to advise Mark that the inheritance needed to be turned over the Hardesty and another month after that to unequivocally instruct Mark that he should notify Hardesty of the inheritance directly rather than working through her. When she finally did, Mark sent Hardesty a letter about two weeks later informing him of the inheritance, doing so before Mills herself then contacted Hardesty. Although Mark could have acted more promptly, it is simply inconsistent with the record to contend that Mark failed to report the inheritance to Hardesty.

### F. The Failure to Deliver Part of the Inheritance Was Neither Knowing Nor Fraudulent.

The only real question is whether the Debtors knowingly and fraudulently failed

to deliver a portion of the inheritance to Hardesty. Based on the facts set forth below, the Court finds that the Debtors did not know that the inheritance was property of Mark's estate at the time they used a portion of it to pay for living expenses, that they did not fraudulently withhold that portion from Hardesty and that they therefore did not knowingly and fraudulently fail to deliver any part of the inheritance to Hardesty.

Rather than demonstrating that Mark knew that the funds were property of his bankruptcy estate, the evidence instead shows that he was merely acting out of an abundance of caution and seeking reassurance when he contacted Mills about the effect of his father's death. Tr. at 165–66, 206. As discussed above, by February 10, 2014, Mark had informed Mills of his having become entitled to an inheritance as the result of a death that had occurred within 180 days after the Petition Date. That was all the information Mills needed to advise Mark that Bankruptcy Rule 1007(h) required the filing of a supplemental schedule that would have notified Hardesty of the inheritance. Mills, however, did not respond to Mark's February 10 e-mail. Given her lack of response, Mark sent a follow-up e-mail on February 14, 2014, stating that he was "[c]urious if you had a chance to look into this yet," UST Ex.3d at 5, conduct that is inconsistent with any intent on the Debtors' part to defraud the Chapter 7 trustee.

The answer to Mark's inquiry was straightforward: Due to the timing of his father's death—a fact of which Mark had made Mills aware—the inheritance was property of Mark's bankruptcy estate that he was required to surrender to Hardesty unless an exemption from property of the estate could be claimed. But rather than so advising Mark straight away, Mills told him in an e-mail dated February 14, 2014

(in response to his follow-up e-mail of the same date) that she "need[ed] a little bit more information" and asked Mark to visit her office so that she could "review the information [he had] already received from the probate estate." *Id.* Mark responded that he had "everything scanned ... in one file," asking if he should forward the documents to Mills, an inquiry to which she answered in the affirmative on February 19, 2014. *Id.* at 10–11.

On February 21, 2014, with the Debtors even more cash-strapped as a result of Jennifer's having been on disability leave since the month before, Mark deposited the $3,465.86 check into a joint bank account so that the Debtors could make overdue mortgage payments. Timeline at 1; Tr. at 239–44. To put his conduct in proper context, it is important to keep one thing in mind. Mark testified—and after assessing his credibility the Court believes him—that Mills's failure to provide him the legal advice that she could have given him back on February 10, 2014, which was 11 days before he deposited the check, led him to believe that doing so was permissible. Tr. at 195,210–11; Dep. at 43. The Debtors sincerely believed—albeit wrongly—that depositing the check was permissible; they mistakenly thought that funds received more than 180 days after the Petition Date as a result of an inheritance were not property of the bankruptcy estate. Tr. at 158, 180, 182, 184, 216; Dep. at 49–50.

Evidence other than Mark's testimony corroborates that this belief, while incorrect, was genuine. Again, Mark informed Mills of his father's death and followed up with her when she did not respond. There is no evidence in the record suggesting that the Debtors had any reason to believe that Mills, an officer of the Court, would stand idly by while a client fraudulently failed to surrender property of a bankrupt-

cy estate to the Chapter 7 trustee. In fact, the Engagement Letter/Fee Agreement for Bankruptcy Chapter 7 or Chapter 13 with the Mills law firm (the "Engagement Letter") (UST Ex. 3a) states: "If a client, in the course of representation by a lawyer, perpetrates a fraud upon any person or court, the lawyer is obligated to call upon the client to rectify the same. If the client refuses or is unable to do so, the attorney is required to reveal the fraud to the affected person or court." Engagement Letter at 3. It defies common sense to conclude that Mark would have contacted Mills at all—and would have followed up with her—if the Debtors intended to withhold from creditors funds that they knew were property of Mark's bankruptcy estate. Further, an e-mail that Mark sent to Mills in April 2014, which is discussed in more detail below, confirms that he simply misunderstood the ramifications that the date of his father's death had for his bankruptcy case.

After a delay caused by Mark's inability to actually attach the files as a single document, Tr. at 169, he sent Mills an e-mail on February 25, 2014 with 38 separate documents, which were all of the documents relating to his father's probate estate that he had received. *See* Debtors' UST Ex.3d at 36–54; Tr. at 170. It would take Mills more than a month to respond to Mark's February 25 e-mail. When Mark still had not received a response to his e-mail more than a week later, he followed up with Mills on March 7, 2014, stating that he was "[j]ust checking to see if [she] got all the info a week or so ago, and if so, [whether] there are any updates to this?" Debtors' UST Ex.3d at 54. Again, Mark would not have repeatedly brought the matter to the attention of Mills if he had been seeking to defraud the Chapter 7 trustee.

Not having heard back from Mills in response to his February 25 e-mail, Mark deposited the $13,675.67 check into a joint bank account on March 10, 2014. Tr. at 197, 210, 244. The Debtors used those funds to make payments on their mortgage; paid cell phone and cable bills and current and past-due utility bills (including gas, water and electricity); and paid real-estate taxes as well as taxes (in the approximate amount of $7,000) that they owed on account of withdrawals from their retirement accounts. Tr. at 182, 204–05, 244–48. Rather than depositing the check in the amount of $943.52, Mark cashed it, and Jennifer took most of the funds to a Kroger grocery store to pay an over-due electricity bill because she believed that the utility company was "going to come out that night or the next day and disconnect our electricity." Tr. at 240. She used the remainder of the funds to pay other bills or buy food for the family. Tr. at 240–41. Although Mark could not recall when the $943.52 check was cashed, the Court finds that he had cashed it by the time Mills advised him in April 2014 that the checks should be turned over to Hardesty. As discussed below, on the date Mills advised him that the checks should be turned over to Hardesty, Mark responded that "[t]he money itself is gone." UST Ex.3d at 55. Although the UST attempted to elicit testimony from Jennifer establishing that funds from the checks remained in the Debtors' bank account when Mills advised them in April 2014 that the checks needed to be surrendered to Hardesty and that the Debtors used some of those funds after that time, Tr. at 247–48, the UST failed to prove by a preponderance of the evidence that the Debtors spent any of the funds derived from the checks after they became aware that the funds were property of Mark's bankruptcy estate. The Court finds that the Debtors were acting in accordance with their good-faith belief that

the funds were not property of Mark's bankruptcy estate when Mark cashed or deposited all three checks and when the Debtors used the inherited funds to pay bills and meet their family's needs.

On April 2, 2014, Mills finally sent Mark an e-mail advising him that "because [his] father passed away within six months of [his] case being filed, we have to notify [Hardesty] of [the] inheritance[,]" informing Mark that Hardesty was entitled to the inheritance and instructing him to forward all the checks to her. UST Ex.3d at 54. Two aspects of this e-mail are notable. First, Mills said that *"we* have to notify the Trustee of your inheritance" (emphasis added) and instructed Mark to forward the checks to her. Mills's instruction reasonably led Mark to believe that she remained the Debtors' attorney and that she would take care of notifying Hardesty of the inheritance. Tr. at 197–98. By contrast, Mills testified that she considered her representation of the Debtors as having terminated when they received their discharge or at least when their case was closed, Tr. at 58, stating that "[t]he fee agreement indicates the representation ceases" at that time. Tr. at 59. But the Engagement Letter does not state that the representation ceases once the Debtors received their discharge or their case was closed. In fact, the only reference to discharge or case closing in the Engagement Letter is as follows: "Your fee is based upon performance of the following services: ... (4) One telephone call per week to the office, until receipt of notice of discharge.... [A]ddditional telephone calls [are] $25.00 per call[.]" Engagement Letter at 2. It is not clear from this statement that the representation terminates after the Debtors receive a notice of their discharge; the statement could just as well be read to mean only that the Debtors would be charged $25 for any telephone

call they made to Mills after receipt of the notice of discharge.

In support of her position that she had not been representing the Debtors ever since they began communicating with her in February 2014 and were not representing them in April 2014, Mills also relied on a letter from her office dated November 27, 2013 (the day Mark's father died) stating:

> Congratulations! You have received your Chapter 7 Discharge and your Chapter 7 case has been closed at the United States Bankruptcy Court. At this time, I will close your bankruptcy file at my office. Please schedule an appointment to pick up your original documents, if you have not already done so. Please contact me if you have any further concerns in the future. It has been à pleasure representing you. Thank you for allowing Mills Law Office to assist you.

UST Ex. 4. But Mills herself testified that she could not "tell you ... how they would read that." Tr. at 59. In addition, as discussed above, when Mark contacted Mills in February 2014 to inquire about the implications of his father's death, she did not advise him to contact Hardesty, but instead responded in the way an attorney would respond to a client, asking him if he had received an inheritance and apprising him that she would "let [Mark] know if [his father's] passing will matter for your bankruptcy." UST Ex.3d at 3. This is precisely what she had said she would do when, on December 3, 2013, she sent the Debtors an e-mail asking them to "schedule [their] final appointment" at which she would "answer any questions [they have] regarding the bankruptcy's affect [sic] for future financial transactions." UST Ex.3d at 1. Yet Mills testified that her February 2014 e-mail to Mark was part of "an initial consultation" for poten-

tial future legal representation of the Debtors. Tr. at 61. To the contrary, the Court finds that Mills's e-mails to the Debtors led them to reasonably believe that she continued to represent them and that she would be handling any necessary communications with Hardesty.[7]

The second notable aspect of Mills's April 2, 2014 e-mail is the basis for Mills's conclusion that Hardesty was entitled to the inheritance: Mark's father had died within 180 days after the Petition Date, information Mark had made known to Mills back on February 10, 2014. In other words, Mills sent her April 2 e-mail advising Mark that the inheritance needed to be turned over the Hardesty nearly two months after Mark provided her with the only information on which she relied in rendering that advice. Expressing shock at receiving this advice from Mills, Mark replied the same day, pointing out that "[t]his would have been valuable information when I first asked" and informing her that "the money [from the three checks he had already received] is gone." UST Ex.3d at 55. Exhibiting his misunderstanding of the legal ramifications of the date of his father's death, Mark continued: "Nothing else has come in to me, and even if it does, from how you worded this it has been past 6 months since the bankruptcy was filed." *Id.* In other words, Mark still did not comprehend that, because his father had died within 180 days after the Petition Date, the inheritance was property of his bankruptcy estate. This e-mail corroborates his testimony that, despite having received and presumably read the Trustee Handout and the Bankruptcy In-

formation Packet, he misunderstood the implications of the date of his father's death for the Debtors' bankruptcy case. Because his conduct was predicated on an honest misunderstanding, the Court finds that he was not acting knowingly and fraudulently when he cashed or deposited the three checks he received in January and February 2014.

Angry that Mills had not promptly advised him of his obligation to turn the inheritance over the Hardesty, Mark included in his April 2 e-mail remarks such as "[t]his is horrible service on your end and word about this will get around," and "I would expect to hear from you about this soon, but with the way you treat clients I know that won't happen for weeks if not months." *Id.* Thus, it is understandable that Mills took nearly a week to compose a careful response. On April 8, 2014, she sent the Debtors a letter via e-mail and regular mail. Notably, Mills' s letter did not state that she no longer considered the Debtors her clients at the time they received notice of their discharge or when their case was closed. Instead, she reminded them that her Bankruptcy Information Packet discussed their obligations with respect to inheritances, that the Trustee Handout advised them of the requirement to report inheritances to which they became entitled within 180 days after the Petition Date and that she had discussed this requirement with them after the meeting of creditors. She also stated that she was "surprised to learn that [the Debtors] spent some of the inheritance" because, according to Mills, Mark had "stated in an email that [he was] not going to cash any

---

7. In fact, Mills' s time sheets related to her representation of the Debtors from December 2013 through May 2014 repeatedly refer to them as her "clients." *See* Debtors' Ex. B (entries dated 12/3/13 stating "I emailed clients to schedule an appointment" and "I reviewed and responded to client's email"; entries dated 2/10/14, 2/14/14, 2/19/14 and 4/2/14 stating "I reviewed and responded to client's email"; entry dated 5/7/14 stating "I reviewed and responded to client's email requesting him schedule an appt to sign and contact Trustee re inheritance.").

checks 'for fear of it messing up the bankruptcy.'" UST Ex.3d at 44–45. In other words, it appears that the string of e-mails between Mark and Mills that began in February 2014 had resulted in a misunderstanding. She had read his e-mails to mean that he would not cash the checks while he was waiting to hear back from her. Her supposition was reasonable, for while Mark was laboring under the mistaken belief that it was permissible for him to cash the checks, Mark's misapprehension was not evident from his e-mails. By contrast, Mark meant only what he had said— that he had not yet cashed the checks.

In her April 8, 2014 letter, Mills also explained that her "office has multiple procedures in place designed to prevent issues such as this [from happening]" including conducting an in-person meeting after a Chapter 7 case is closed "to discuss [anything] that may have happened or changed." UST Ex.3d at 44. Indeed, if the Debtors had visited Mills in person, it is possible that Mark would have clearly expressed his view that he could spend the inheritance, and it is also possible that Mills would then have realized the importance of promptly disabusing him of that notion. But the Debtors' failure to meet with Mills in person and the misunderstanding that arose as a result, while unfortunate, does not equate to knowing and fraudulent conduct on the part of the Debtors.

Mills stated at the end of her April 8 letter that Hardesty would need certain information and requested that the Debtors "[p]lease provide the requested information as soon as possible." UST Ex.3d at 45. She did not, however, make clear whether the Debtors should provide that information to her or directly to Hardesty. Again, in her April 2, 2014 e-mail Mills had stated that "*we* have to notify the trustee of [the] inheritance" and had instructed Mark to forward all the checks *to her*, which reasonably led him to believe that Mills, as his counsel, would be the conduit for the information. Likewise, a reasonable reading of the April 8 letter was that Mills would be handling the communications with Hardesty. Although Mark considered contacting Hardesty directly, he did not have Hardesty's contact information; the Trustee Handout that he had received in August 2013 included that information, but he apparently had misplaced the document over the intervening months. Tr. at 199–200. And so Mark continued to work through Mills, responding to her April 8 letter the same day she sent it. "How much would need to be turned over to the trustee?" he asked, also inquiring, among other things, whether there were "exemptions that can be filed?" He explained that "[t]he reason the checks were cashed is because finances hit us hard yet again and we had no choice or my kids wouldn't have food on the table and our utilities would have been turned off long ago[,]" also stating that the Debtors had "paid off property taxes, and made payments on the mortgage." UST Ex.3d at 56.

It took Mills a month to respond to Mark's April 8, 2014 e-mail. On May 7, 2014, Mills sent Mark an e-mail, stating that "I think it will be best to schedule an appointment to discuss your questions." UST Ex.3d at 56. For the first time since they began corresponding, she told Mark unequivocally to "contact your Trustee (if you have not already done so) to let him know that you anticipate receiving an inheritance due to the passing of your father." She then provided Mark with the mailing address and telephone number for Hardesty. *Id.*

The first person to contact Hardesty about the inheritance was Mark. Sometime in the middle of May 2014, he sent a letter

through the mail informing Hardesty that he had received an inheritance from his father and had spent some of the inherited funds. Tr. at 116, 175. On May 22, 2014, Mark called Hardesty to see if he had received the letter, but did not reach him and left a voicemail. Tr. at 176–77. Mills also called Hardesty that day, left him a voicemail and sent him a follow-up e-mail, stating that Mark's "father passed away in November and he is in process of getting inheritance." She continued: "I have advised him to contact you and notify you of the inheritance. I have not heard from either yourself or Mr. and Mrs. Davis that this has been done so I wanted to follow up with you to make sure you are aware of this situation." UST Ex.3d at 58. At some point that day, Mills and Hardesty spoke. A telephone record by Mills states that Hardesty told her that he would "file claims if creditors don't file claims." Debtors' Ex. C.

That afternoon (after having received a voicemail from Mark as well as the communication from Mills), Hardesty went through "a stack of mail" that he had retrieved earlier that day from his post office box and found the letter that Mark had sent in mid-May. Tr. at 115–16. After reading the letter, Hardesty called Mark, left him a voicemail, Tr. at 116, and sent him a follow-up e-mail stating that "[y]our letter is very ambiguous, so I will need specific information regarding your father's estate." UST Ex.3d at 60. Neither the UST nor the Debtors put Mark's letter to Hardesty into evidence, so the Court is unable to determine why Hardesty considered Mark's letter informing him of the inheritance to be "ambiguous." In any event, on May 22, 2014, Hardesty informed Mark that "[t]he deadline to call me, or e-mail me, so that we can start a dialogue is Tuesday, May 27th." *Id.* Meeting that deadline, Mark spoke to Hardesty on the telephone on May 22, 2014, again

informing him that he had received an inheritance and had spent some of the funds. He also made Hardesty aware that he would be receiving more funds from his father's estate in the future. Tr. at 117, 177–78.

During his testimony, Hardesty attempted to cast Mark as having been evasive during their conversations in May 2014. Tr. at 134. Hardesty provided only two examples of this purported evasiveness. First, he testified that Mark did not initially provide him with the name of the Iowa probate attorney handling his father's estate. But Hardesty conceded that Mark, who apparently could not recall the name of the attorney during their initial conversation on May 22, 2014, did get back to him with the name of the attorney. Tr. at 118, 134–35. Second, Hardesty testified that the letter Mark sent him in mid-May 2014 was ambiguous. Tr. at 134. Again, however, the UST did not put the letter into evidence, so the Court has no way of assessing Hardesty's contention. And on May 23, 2014, Mark sent Hardesty an e-mail "with every piece of information I had on my father's estate with scanned documents." Timeline at 2; Tr. at 144, 178. That same day, Hardesty responded with an e-mail that, according to Mark, "ask[ed] questions I already answered over the phone and in an email." Timeline at 2.

Rather than continuing this dialogue with Mark, Hardesty filed a motion for turnover of the inheritance (the "Turnover Motion") (Doc. 21) on May 27, 2014. Hardesty stated in the Turnover Motion that "Mills informed the Trustee that she told Mr. Davis to call the Trustee in February, 2014." Turnover Mot. at 1. As discussed above, the record does not bear that out. In fact, it was not until April 2, 2014 that Mills finally informed Mark that "we have to notify the trustee of [the] inheritance" and instructed him to forward all checks to

her, and it was not until May 7, 2014 that Mills unequivocally instructed Mark to contact Hardesty directly. In the Turnover Motion Hardesty also noted that he "received a letter from Debtor on May 22, 2014" that "was dated May 8, 2014," stating that the "letter contained ambiguous information regarding the inheritance, and debtor indicated that he was using some of the inheritance for expenses." Turnover Mot. at 2. This is a reference to the letter that Mark—in the first communication sent to Hardesty about the inheritance—mailed to Hardesty in mid-May 2014. In other words, according to Hardesty's representations in the Turnover Motion, Mark not only informed Hardesty of the inheritance, he also revealed to Hardesty that he had used some of the inheritance to pay expenses.

On May 27, 2014, Hardesty served a Notice of Need to File Proof of Claim Due to Recovery of Assets on the Debtors' creditors, giving them approximately three months to file proofs of claim. The notice stated that "[c]reditors who wish to share in any distribution of funds must file a proof of claim with the clerk of the bankruptcy court" by August 25, 2014. Docs. 23 & 25. Only two creditors filed proofs of claim, one against Mark in the amount of $29,825.90 on account of student-loan debt that he had incurred solely in his name in 2009 (Claim 1–1) and another against Jennifer in the amount of $3,663.89 on account of student-loan debt that she incurred solely in her name in 2012 (Claim 2–1).

On May 29, 2014, Mark sent Hardesty another e-mail with "several question[s] on the situation and got no reply." On June 4, 2014, Mark "[i] Inquired again [of Hardesty] why I was not getting any contact from him and to please reply." That same day, Hardesty sent Mark an e-mail recommending that he seek legal counsel. Timeline at 2.

Mark did so. On June 11, 2014, Nesbitt filed a notice of substitution as bankruptcy counsel for the Debtors. At some point, Mark received another inheritance check dated May 20, 2014. He sent it to Nesbitt, who in turn sent it to Hardesty. Tr. at 121–22, 203–04, 217. On June 17, 2014, Nesbitt filed a response to the Turnover Motion on behalf of the Debtors (the "Turnover Response") (Doc. 28). The Turnover Response made clear that the Debtors did not want to turn over more of the inheritance than was necessary to pay creditors of Mark's bankruptcy estate who actually filed proofs of claim and whose claims were allowed. *See* Turnover Mot. at 2–3 ("The joint administration of separate bankruptcy estates ... does not permit the trustee to use assets of the solvent estate [to] pay claims [of] creditors of the insolvent estate, even if jointly administered. Therefore, to the extent that the trustee is able to recover assets from Debtor Mark E. Davis as a result of Debtor's interest in the probate estate, only creditors of Debtor Mark E. Davis may seek recovery from the bankruptcy estate. No creditor who is solely a creditor of joint debtor, Jennifer Ann Davis, should be allowed to recover from the bankruptcy estate. Further, to date, no claims have been filed in Debtor's case. The claims filing deadline is August 25, 2014 and Debtor should only be required to turnover funds sufficient to pay the allowed, filed claims of Debtor Mark E. Davis."). Although the Debtors clearly did not want to turn the inheritance over to Hardesty, that does not mean that they knowingly and fraudulently failed to do so.

Hardesty had served the notice of the deadline to file proofs of claim on the Debtors' creditors back on May 27, 2014, giving them until August 25, 2014 to file proofs of claim. As noted above, by the time that deadline came and went, only

two creditors had filed proofs of claim, one against Mark and the other against Jennifer. On August 25, 2014, Hardesty filed a motion seeking substantive consolidation of the Debtors' bankruptcy estates (the "Substantive Consolidation Motion") (Doc. 38). The Debtors initially objected to the Substantive Consolidation Motion, but eventually consented to the relief requested, meaning that the Debtors' assets and liabilities would be pooled. The first day that claims could be filed on behalf of creditors was August 26, 2014.[8] The next day, on August 27, 2014, Hardesty filed proofs of claim on behalf of the 16 creditors on the Debtors' schedules of assets and liabilities that had not filed claims, bringing the amount of the claims pool to nearly $233,000. Apparently having failed to conduct any investigation before filing the proofs of claim, Hardesty filed each of the proofs of claim against both of the Debtors. Hardesty filed the proofs of claim in this manner even though the Court had not approved the Substantive Consolidation Motion and even though the Debtors had not yet agreed to the relief requested in that motion.

The Debtors filed an objection to the 16 proofs of claim filed by Hardesty (the "Claim Objection") (Doc. 72). Among other things, the Debtors argued in the Claim Objection that, unlike substantive consolidation, "[t]he joint administration of separate bankruptcy estates ... does not permit the trustee to use assets of the solvent estate pay claims to creditors of the insolvent estate" and that "to the extent that [Hardesty] is able to recover assets from Debtor Mark E. Davis as a result of [his] interest in the probate estate, only creditors of Debtor Mark E. Davis may seek recovery from the bankruptcy estate." Claim Objection at 4.

After the Court held a status conference on the Turnover Motion, the Debtors and Hardesty entered into an agreed order (Doc. 73) under which Mark agreed to deliver all inheritance funds that "would otherwise be distributable to Mark Davis" to Hardesty to maintain in his trust account pending further order of the Court. On September 2, 2014, the Debtors filed a supplemental schedule (Doc. 71) listing the inheritance and claiming exemptions in the aggregate amount of $1,675, as contemplated by Bankruptcy Rule 1007(h). Hardesty filed an objection (Doc. 76) to the claim of exemptions on the basis that Mark had already spent some of the settlement.

The Debtors and Hardesty eventually entered into a settlement resolving the exemptions dispute, the Turnover Motion, the Claim Objection and the Substantive Consolidation Motion. Under the settlement, the Debtors turned over to Hardesty the nearly $120,000 remaining amount of the inheritance, which would go to pay all of their debts, including the obligations on which Jennifer was solely obligated. The Debtors, though, were not required to repay the approximately $18,000 of the inheritance they spent before the case was reopened. See Debtors' Ex. G at 1. Hardesty explained that he decided not to attempt to recover the amount the Debtors spent before the case was reopened in part because "[i]t is simply uneconomic to think

---

8. Under the Bankruptcy Code, "[i]f a creditor does not timely file a proof of such creditor's claim, the debtor or the trustee may file a proof of such claim." 11 U.S.C. § 501(c). Bankruptcy Rule 3004 states:

> If a creditor does not timely file a proof of claim under Rule 3002(c) or 3003(c), the debtor or trustee may file a proof of the claim within 30 days after the expiration of the time for filing claims prescribed by Rule 3002(c) or 3003(c), whichever is applicable. The clerk shall forthwith give notice of the filing to the creditor, the debtor and the trustee.

Fed. R. Bankr. P. 3004.

that any timely collection would be meaningful, given both Debtors' employment situations, and considering their need to raise their minor children." *Id.* at 2. The Court entered an order approving the settlement, *see* Debtors' Ex. F and Doc. 81, and the Debtors complied with its terms, paying nearly $120,000 to Hardesty.

On February 24, 2015, Hardesty filed a final account and distribution report (Doc. 88). According to the final report, Hardesty received $119,619.78 from the Debtors as a result of the inheritance. From that amount Hardesty disbursed approximately $90,000 to holders of unsecured claims aggregating nearly $233,000, providing them a recovery of about 39%. If Hardesty had not filed proofs of claim for those creditors that failed to do so, the creditors that filed claims would have received a 100% recovery. Tr. at 147.

In excess of $19,000 was paid to Hardesty's counsel, Brent Stubbins, and more than $9,000 to Hardesty for his Chapter 7 trustee fee, which is based on a percentage of funds disbursed "to parties in interest, excluding the debtor[.]" 11 U.S.C. § 326(a). Because trustees do not receive a percentage of any surplus funds distributed to debtors,[9] the fee Hardesty received

would have been much less if he had not filed proofs of claim for the creditors that failed to do so, but instead made distributions only to those that did and returned the surplus to the Debtors. Hardesty's filing proofs of claim also made it impossible for him to make a 100% distribution to creditors that had filed claims. Tr. at 147.

## V. Legal Analysis

### A. Denial of Discharge Under § 727(d)(2)

The Court must grant the UST's request to revoke the Debtors' discharge if they "acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate" and (1) "knowingly and fraudulently failed to report the acquisition of or entitlement to such property," or (2) "knowingly and fraudulently failed ... to deliver or surrender such property to the trustee[.]" 11 U.S.C. § 727(d)(2). Although the Debtors do not dispute that the inheritance was property of Mark's bankruptcy estate,[10] they do contest the UST's allegations that they failed to report the inheritance and that their failure to surrender a portion of it to Hardesty was knowing and fraudulent.

---

**9.** Under § 726 of the Bankruptcy Code, Chapter 7 trustee are required to distribute to the debtor any surplus funds remaining after distributions to holders of claims. 11 U.S.C. § 726(a)(6).

**10.** Counsel for the Debtors argued that Jennifer is not a proper defendant in this adversary proceeding because it was only Mark who "acquire[d] or [became] entitled to acquire [property of the estate] within 180 days after [the Petition Date] ... by ... inheritance[.]" 11 U.S.C. § 541(a)(5)(A). Tr. at 286–87. The Court can see the potential validity of this argument. There is, however, authority supporting the proposition that a spouse who was not the beneficiary of the inheritance may be a defendant in a § 727(d)(2) action. *See Nazar v. Nagel (In re Nagel),* No. 01–14827, 2003

WL 23811677, at *4 (Bankr.D.Kan. Sept. 19, 2003) ("The trustee's complaint seeks the revocation of John Nagel's discharge even though John was not the legatee under McCrimmon's will.... [But] John knew of the existence of the bequest and Judith's entitlement to it.... His position of knowledge affirmatively obligated him to disclose the receipt of the bequest and, at a minimum, he was required to amend the schedules and comply with the trustee's reasonable requests for information. John instead did nothing and, on that basis alone, should be held accountable under § 727(d)(2)."). Because the Court finds that neither of the Debtors knowingly and fraudulently failed to report or deliver the inheritance to Hardesty, the Court need not and does not decide this issue.

▮ As the party seeking to revoke the Debtors' discharge under § 727(d)(2), the UST has the burden of proving by a preponderance of the evidence that the Debtors failed to (1) report the acquisition of or entitlement to property of the estate and (2) deliver this property of the estate to the trustee. The UST also must prove that those failures occurred knowingly and fraudulently. *See, e.g., Miller v. Gilliam (In re Gilliam)*, No. 09–01091, 2012 WL 1191854, at *8 (9th Cir. BAP Apr. 6, 2012); *see also Barclays/Am. Bus. Credit, Inc. v. Adams (In re Adams)*, 31 F.3d 389, 394 (6th Cir.1994) (relying on *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)—in which the Supreme Court held that a creditor must prove exceptions to dischargeability for individual debts by a preponderance of the evidence—in holding that "the exceptions to discharge[ ] under Section 727, including the exception for fraud, require proof by a preponderance of the evidence.").[11]

A correct application of § 727(d)(2) requires an understanding of its key terms—the adverbs "knowingly" and "fraudulently." One court has defined "knowingly" as used in § 727(d)(2) to mean "not ... accidentally, involuntarily, or negligently." *Richardson v. Flaugher (In re Flaugher)*, 525 B.R. 67, 71 (Bankr.C.D.Ill.2015). Applying this definition, it might be said that a debtor who lacks knowledge that property is property of the estate nonetheless acts knowingly so long as his failure to report or deliver property to the trustee was not accidental, involuntary or negligent. Other courts, though, have held that a debtor knowingly fails to report or deliver property of the estate only if the debtor knows that the property is property of the estate at the time he fails to report or

deliver it. *See Wallick v. Thunberg (In re Thunberg)*, 413 B.R. 20, 26 (Bankr.D. R.I. 2009) ("[T]o establish that an act was done 'knowingly,' the Trustee must show that 'the Debtor's failure was accompanied by knowledge that the property in question belonged to the estate and that he was obligated to report or surrender it[.]' " (quoting *Grossman v. Foster (In re Foster)*, 343 B.R. 385, 393 (Bankr.D.Mass. 2006))), *aff'd*, 2010 WL 1838003 (D.R.I. May 5, 2010), *aff'd*, 641 F.3d 559 (1st Cir. 2011); *Houghton v. Marcella (In re Marcella)*, No. 07–04158, 2009 WL 3348251, at *15 (Bankr.D.Mass. Oct. 15, 2009) (" 'Knowingly' requires proof that [the debtor was] consciously aware that the acquired property was property of the estate.").

▮ "[B]ecause revoking a discharge is an extraordinary remedy, § 727(d) should be construed liberally in favor of the debtor and strictly against those objecting to discharge[.]" *Marcella*, 2009 WL 3348251 at *13 (quoting *Yules v. Gillis (In re Gillis)*, 403 B.R. 137, 144 (1st Cir. BAP 2009)). Thus, if the Court had to decide the issue, it would hold that a debtor acts "knowingly" only if he has knowledge at the time he fails to report or deliver property to the trustee that the property is property of the estate. But even if a debtor could lack knowledge of the property's status as property of the estate and still be found to have acted "knowingly," courts have held that a debtor acts "fraudulently" within the meaning of § 727(d)(2) only if the debtor knows that his conduct is improper. *See Seaver v. Markey (In re Markey)*, 378 B.R. 594, 603 (Bankr.D.Minn.2007) ("[A] debtor's

11. At trial, counsel for the Debtors relied on *Hunter v. Hall (In re Hall)*, 84 B.R. 472 (Bankr.N.D.Ohio 1987), in support of her argument that the UST was required to prove his case by clear and convincing evidence. As the Court pointed out, however, *Hall* was decided before the Supreme Court's issuance of *Grogan*. Tr. at 277–78.

conduct is 'fraudulent' under § 727(d)(2) where the debtor is aware of the wrongfulness or impropriety of the disposition, deliberately fails to make disclosure to the trustee, and harbors a simple intent to go ahead in the disposition, whether it is directly for the debtor's benefit or not."). This makes sense, because the word "fraudulently" implies that the failure to disclose or deliver property of the estate was part of a scheme by the debtor to deceive or "put one over on" the trustee. *Id.* at 603; *see also Flaugher*, 525 B.R. at 72 ("To understand what acting 'fraudulently' or with ' fraudulent intent' means, reference to the definition of ' fraud' is instructive. Broadly defined, fraud is 'any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another.' ") (quoting *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir.2000)). And it cannot be said that a debtor who fails to report or deliver property to a trustee is attempting to cheat the trustee if the debtor lacks knowledge that the property is property of the estate. Thus, whether it is § 727(d)(2)'s use of the term "knowingly" or the term "fraudulently"—or both—that requires it to do so, a bankruptcy court must find that a debtor had knowledge that property was property of the estate at the time he failed to report or deliver it before the court can conclude that the debtor "knowingly and fraudulently" failed to report or deliver the property to the trustee.

■ That said, knowledge and "fraudulent intent may be inferred from all the facts and circumstances" and from the debtor's "whole pattern of conduct," including conduct that exhibits a "reckless indifference to the truth." *Sicherman v. Rivera (In re Rivera)*, No. 06–8013, 2007 WL 130415, at *5 (6th Cir. BAP Jan. 11, 2007). In *Rivera*, a decision on which the UST relies, the Chapter 7 debtor attempted to justify his failure to report that he had received and spent $80,000 of a personal injury settlement that was property of his estate. The debtor denied knowledge of his obligation to turn over the $80,000 to the trustee, basing his denial of knowledge on his purported belief that his personal injury attorney had reached an agreement with the trustee for the turnover of a lesser amount. But there in fact was no such settlement, the debtor's bankruptcy counsel had advised the debtor after he received the $80,000 that the entire settlement amount needed to be turned over to the trustee, and during the meeting of creditors the debtor had acknowledged that his personal injury lawsuit was property of his bankruptcy estate. All of these facts and circumstances "permit[ted] only one *reasonable* inference: the Debtor knew he was obligated to turn over the *full* settlement" and "[h]is 'whole pattern of conduct' supports a finding of fraudulent intent." *Id.* at *7.

■ Likewise, a debtor's failure to read the information provided by the Chapter 7 trustee may support a finding of a reckless disregard for the truth and an inference of fraudulent intent. *See Fokkena v. Klages (In re Klages)*, 381 B.R. 550, 554 (8th Cir. BAP 2008) ("A debtor cannot ignore information given to him and then claim ignorance. Such behavior is so reckless that fraud can be implied."). And in other cases a court may disbelieve the debtor's explanation for his failure to report and deliver property of the estate to the trustee. For example, in addition to receiving the written information that he claimed not to have read, the debtor in *Klages* had received an oral directive from the trustee that he turn over copies of his tax returns and not spend any tax refund without first contacting the trustee, a warning the debtor conceded having heard. After the debt-

or spent the tax refund without contacting the trustee and the trustee brought a complaint to revoke his discharge, the debtor attempted to justify his conduct by explaining that he believed his receipt of a bankruptcy discharge permitted him to spend the tax refund. "[C]arefully observing the Debtor's demeanor while he testified[,]" the bankruptcy court found that his explanation "was not credible" and revoked the debtor's discharge, a decision that the bankruptcy appellate panel affirmed after "afford[ing] due deference to the bankruptcy court's determination." *Id.* In other words, a debtor cannot negate a finding of knowledge and fraudulent intent by relying on a purportedly incorrect belief that the bankruptcy court finds to be implausible.

By contrast, a debtor operating under a mistaken but genuine belief that property does not need to be turned over to the trustee may be able to negate a finding of knowledge and fraudulent intent. That is, depending on the facts and circumstances and the debtor's whole pattern of conduct, a debtor may be in a position to persuade a bankruptcy court that the plaintiff has not carried his burden of proving by a preponderance of the evidence that the debtor's failure to report and deliver property of the estate to the trustee was knowing and fraudulent. *See Morris v. Morris (In re Morris)*, No. 07–5058, 2008 WL 819296, at *6 (Bankr.D.Kan. Mar. 26, 2008) ("The Court is not convinced of Debtor's fraudulent intent.... Although Debtor's understanding ... was misguided, it was not fraudulent"); *Morris v. Wright (In re Wright)*, 371 B.R. 472, 481 (Bankr.D.Kan. 2007) ("Wright acted on the belief that what he and his ex-wife verbally agreed to concerning the 2004 refund controlled what the trustee was entitled to receive. While that belief was misguided and ill-advised, the Court is not convinced that Wright acted with fraudulent intent.").

**B. Section 727(d) Applied**

**1. Alleged Failure to Report**

■ The Debtors did not knowingly and fraudulently fail to report the inheritance. In fact, Mark reported the inheritance to Mills in early February 2014. Mark's doing so in and of itself arguably fulfilled the Debtors' reporting obligations. Although the Trustee Handout on which the UST relies instructed the Debtors to notify Hardesty of any inheritance to which they became entitled within 180 days after the Petition Date, Chapter 7 debtors fulfill many of their obligations—including their obligations to provide notice to parties in interest—through counsel. *See U.S. Tr. v. Pokrivnak (In re Coe)*, No. 5:12–AP–7110, 2013 WL 9963675, at *7 (Bankr.W.D.Ark. Sept. 6, 2013) ("[O]nce her mother died, the debtor did, in fact, advise her attorney of her mother's death and faxed him... copies of her mother's will and statements of the accounts totaling more than $100,000.00 into which the insurance proceeds were deposited. This was exactly what the trustee asked the debtor to do—to inform her attorney of the 'acquisition of any inheritance.' Even though the debtor did not keep her appointment to go over the details of this information, she did report the acquisition of the property to her attorney who then, typically, would have transmitted the information to the trustee."). Further, the Trustee Handout also stated that the Debtors "should consult [their] attorney" with any questions, and Hardesty testified that debtors who have questions "should always call their attorney first[.]" Tr. at 136. The Debtors had questions and rightly directed them to Mills.

In any event, just a few weeks after Mills first unequivocally advised Mark to report the inheritance to Hardesty direct-

ly, Mark sent a letter to Hardesty in mid-May 2014 informing him of the inheritance and of his having cashed or deposited checks, doing so before Mills herself reported the inheritance. True, as the UST points out, it took Mark more than two months after his father died to make Mills aware of the inheritance, so even if Mills had advised him to report the inheritance on the day she learned of it, Mark would have failed to meet the 14-day reporting deadline imposed by Bankruptcy Rule 1007(h). Of course, he should have complied with that deadline. But no provision of the Bankruptcy Code or the Bankruptcy Rules provides that a debtor's discharge shall be revoked merely because he failed to report the acquisition of property of the estate within the time frame required by Bankruptcy Rule 1007(h). Rather, in order for a discharge to be revoked under § 727(d)(2), the debtor's failure to report must be knowing and fraudulent. And the evidence shows that Mark's delay was more likely than not the result of two factors that are in no way indicative of knowledge of the true status of the inheritance or of an intent to defraud Hardesty. First, Mark's mental state after his father's passing—which was corroborated by medical records—explains why it took a while for his thoughts to turn to the implications for the Debtors' bankruptcy case. Second, Mark was operating under an incorrect but sincere belief that the date of his receipt of the checks was the relevant date for determining whether he was required to report the inheritance to Hardesty. Consistent with this belief, Mark made Mills aware of the checks relatively soon after he received them and before he cashed or deposited any of them.

The UST contends that the Debtors' discharge should be revoked based on their alleged failure to report property of the estate. Because the Debtors in fact did report the property, it appears that the

UST's position is that a delay in reporting constitutes a failure to report, a position for which the UST has cited no authority. But assuming for the sake of argument that a delay in reporting may be the functional equivalent of a failure to report, for all the reasons stated above, the Court concludes that the UST did not meet his burden of proving that Mark's delay in reporting the inheritance constituted a knowing and fraudulent failure on the part of the Debtors to report the inheritance.

### 2. Failure to Surrender a Portion of the Inheritance

█ Based on its findings set forth above, the Court concludes that the Debtors were not "consciously aware" that the inheritance was property of Mark's bankruptcy estate at the time Mark cashed or deposited the three inheritance checks. *Marcella*, 2009 WL 3348251 at *15. In fact, until Mills advised them otherwise, the Debtors genuinely believed that they were not required to report or deliver the inheritance to Hardesty. Further, the "facts and circumstances" and the Debtors' "whole pattern of conduct," *Rivera*, 2007 WL 130415 at *5, leads the Court to infer that they had no knowledge of the inheritance's status as property of the estate and that they harbored no intent to defraud Hardesty. The Court reaches this conclusion for multiple reasons.

First, unlike the debtor in *Klages*, the Debtors did not ignore the information provided to them by the Chapter 7 trustee or their attorney. They both read the Trustee Handout. Further, Jennifer conceded that she read the Bankruptcy Information Packet from Mills's law office.

Second, as a result of their faulty interpretation or recollection of those documents, the Debtors honestly believed that an inheritance becomes property of a bankruptcy estate only if the inherited

property is received within the 180–day period after the commencement of the bankruptcy case. Thus, the Debtors thought that Mark's receipt of checks more than 180 days after the Petition Date meant that his inheritance was not property of his bankruptcy estate. The Debtors established that their belief, while mistaken, was genuine. They demonstrated this in part through their testimony at trial and during the Deposition. While the Court might find such testimony to be incredible and conveniently self-serving in other cases,[12] one of the e-mails Mark sent to Mills before this litigation commenced corroborates the Debtors' testimony. As the Court found above, Mills advised Mark on April 2, 2014 that "because [his] father passed away within six months of [his] case being filed, we have to notify the trustee of [the] inheritance." UST Ex.3d at 54. Her statement was accurate and unambiguous. Mark nonetheless misunderstood her, stating in response that "[n]othing else has come in to me, and even if it does, from how you worded this it has been past 6 months since the bankruptcy was filed." UST Ex.3d at 55. After carefully assessing the Debtors' demeanor and credibility, and taking into consideration Mark's corroborating e-mail, the Court finds the Debtors' explanation of their misunderstanding of the legal ramification of the date of his father's death to be credible. Thus, this case is similar to those decisions, such as *Morris* and *Wright,* in which bankruptcy courts have found that the debtors' actions were based on a legitimate misunderstanding of the law rather than fraudulent intent on their part.

Third, Mark made Mills aware of his father's death. The Court finds it implausible that he would have informed Mills of his father's passing in the first place—and then repeatedly followed up with her—if the Debtors were seeking to defraud the Chapter 7 trustee. The UST questions why Mark went ahead and cashed or deposited the checks before he heard back from Mills. Tr. at 269 ("[W]ithout waiting for any kind of definitive response from the attorney he cashed checks. And that was with, in his own words, his own knowing, nagging thought, this might mess things up and he did it anyway."). The answer is that Mills's delay in responding to his inquiry confirmed the Debtors' views about the propriety of cashing or depositing the checks. From Mark's perspective, Mills would have advised him right away not to cash the checks if there were any real chance that cashing them would be a problem.

Fourth, at the time Mark cashed or deposited the checks, his bankruptcy counsel had not yet advised the Debtors of their obligation to turn over the inheritance to Hardesty. This distinguishes the Debtors' case from the *Rivera* decision on which the UST relies. There, after the debtor received funds from his personal injury settlement and before the debtor spent the funds, his bankruptcy attorney had advised him of his obligation to turn over the entire amount of the settlement to the trustee.

Fifth, it is in the Debtors' favor that Mark, like the debtor in *Morris,* expressed genuine shock when Mills finally informed him of his turnover obligation, and it is also to the Debtors' credit that Mark communicated with and provided information to the Chapter 7 trustee after he realized he was required to do so. *See Morris,* 2008 WL 819296 at *6 ("The Court is not

---

12. *See. e.g., Marker v. West (In re West),* 328 B.R. 736, 753 (Bankr.S.D.Ohio 2004) ("Having considered the Debtor's explanation for failing to turn over the Sapphire Ring, observed her demeanor, and assessed her credibility, the Court concludes that West acted with intent to hinder, delay, or defraud the Trustee and/or her creditors.").

convinced of Debtor's fraudulent intent. Debtor was shocked at the amount requested by the Trustee. [But] [s]he very promptly provided the Trustee with all of the information he requested regarding the refunds... Debtor attempted to contact the Trustee three or four times."). Although he certainly could have contacted Hardesty more promptly, Mark did send a letter informing him of the inheritance and apprising him of the fact that he had already cashed and deposited checks, taking this step before Mills herself communicated with Hardesty. Then, as he had done with Mills, Mark followed up with Hardesty, providing him with all of the information he had regarding the inheritance.

That is, the evidence shows that Mark was cooperating with the Chapter 7 trustee, who for some reason decided not to continue their discussions, but instead opted to file the Turnover Motion and encourage the Debtors to retain legal counsel. They did as Hardesty suggested, retaining Nesbitt. Through her, the Debtors contested Hardesty's decision to file proofs of claim on behalf of creditors that had not filed them. The Debtors were reasonably and in good faith relying on the advice of counsel when they opposed Hardesty's filing of proofs of claim for creditors that had opted not to do so.[13]

Sixth, after Mills advised him of his obligation to turn over the checks to Har-

13. As the Court found above, Hardesty's decision to file proofs of claim not only prevented Mark from retaining a substantial part of his inheritance, it also made a 100% distribution to creditors that had filed claims impossible and significantly increased the amount of Hardesty's trustee fee. Because the Debtors and Hardesty reached a settlement, the Court has no occasion to decide whether Hardesty's decision to file claims was appropriate under the circumstances. The Court, however, does note that a significant body of case law calls the decision into question. · See Drew v. Royal (In re Drew), 256 B.R. 799, 805–06 (10th Cir. BAP 2001) ("The factual circumstances in this case also demonstrate a variety of reasons why trustees should exercise caution in filing claims, as this Trustee did, on behalf of creditors who ... chose not to do so. The Trustee had no knowledge of the legal validity of or the actual amount owed on any of the claims, and he apparently made little, if any, inquiry about them."); In re VanCleef, 479 B.R. 809, 819, 826 (Bankr.N.D.Ind.2012) ("There is no reason whatsoever why creditors who make a conscious decision in some manner or simply are so negligent that they fail to make a timely decision—should be benefitted by a distribution in a Chapter 7 case based upon a claim filed by a Chapter 7 trustee so that those creditors receive a distribution, and a debtor does not under 11 U.S.C. § 726(a)(6).·... This practice raises serious issues as to effective case administration and the provability of any proof of claim filed by the Trustee, and in fact places the Chapter 7 Trustee in a position

of not objecting to her own claim in a circumstance in which a similar claim filed by a creditor would be subject to her obligation to object under 11 U.S.C. § 704(a)(5)."); In re McLaughlin, No.· 05–63927, 2007 WL 2571943, at *2, 4 (Bankr.N.D.Ohio Aug. 31, 2007) ("The bankruptcy trustee has a fiduciary duty to the bankruptcy estate and this duty is breached when a trustee files claims without any personal knowledge or investigation.... In this case, Trustee's fee increased significantly due to the claims he filed.... In sum, Trustee has not provided the court with sufficient supporting documentation or valid reasons for the filing [of] any of the claims."); In re Nettles, 251 B.R. 899, 902 (Bankr. M.D.Fla.2000) ("[The Chapter 7 trustee] alleges that he had a duty to file these claims on behalf of the creditors.... [I]t is clear that [the trustee] filed the claims in order to maximize his fee, not to protect the debtor. As such, [the] claims must be disallowed because their purpose is inconsistent with the objectives of § 501(c)."). But see In re Schmidt, 333 B.R. 868, 870 (Bankr.N.D.Fla.2005) ("I do not agree with the interpretation of § 501(c) as set forth in Nettles. The statute clearly permits the Trustee to file a proof of claim on behalf of a creditor that failed to file one, and Rule 3004 sets the time limit. If the Trustee complies with that time limit, then there is nothing in either the Rules nor the Bankruptcy Code to support disallowance of the claim.").

Here, each of the proofs of claim that Hardesty filed asserted a claim against both Debt-

desty, Mark received an inheritance check dated May 20, 2014, but did not cash or deposit it. Instead, he delivered the check to Nesbitt, who in turn sent it to Hardesty. In other words, after his obligation to deliver the checks to Hardesty was made clear to him, Mark complied with the obligation.

 Seventh, it was only because Mark made Mills aware of the inheritance and repeatedly followed up with her about its implications for the Debtors' bankruptcy case that they ultimately turned over nearly $120,000 to Hardesty. While it is conceivable that Hardesty would have discovered the inheritance even if Mark had not made Mills aware of it and then reported it to Hardesty—friends, family members and other third parties sometimes make trustees aware of such things—that is not what happened here. Of course, if a debtor's failure to deliver property of the estate to the trustee was knowing and fraudulent, the debtor's discharge must be revoked under § 727(d)(2) even if the debtor ultimately relents and

turns over the property. For "[w]hy should a bankruptcy debtor deal openly and honestly with the bankruptcy system and its trustee if any risk attendant to fraudulent behavior can be easily neutralized merely by returning or replacing the converted asset if the wrongful behavior is discovered?" *McNally v. Echart (In re Echart)*, 374 B.R. 596, 600 (Bankr. E.D.Tex.2007). To be sure, "the prompt and unconditional fulfillment of th[e] duty [to disclose and deliver property of the estate to the trustee] is the *quid pro quo* for the protections offered by an order of discharge and any refusal by a debtor to fulfill those obligations, *when taken with the requisite mental state*, must trigger a corresponding deprivation of that remedy for which bankruptcy relief is sought." *Id.* (emphasis added). But here the UST did not carry his burden of proving by a preponderance of the evidence that the Debtors had the mental state—knowledge and fraudulent intent—required to trigger the revocation of their discharge.[14]

In light of the foregoing, the Court concludes that the Debtors did not knowingly

---

ors even though the Debtors' estates had not yet been substantively consolidated and even though Hardesty apparently had not conducted the investigation necessary to determine whether the debt truly was a joint obligation or instead was the sole obligation of only one of the Debtors. The two creditors that filed proofs of claim did better; as discussed above, one filed a claim only against Mark and another only against Jennifer. And under the case law cited above, Hardesty's lack of an investigation would have made his filing of proofs of claim questionable even if he had filed the claims only against the debtor who actually had the obligation on the debt

14. Section 727 of the Bankruptcy Code "is directed toward protecting the integrity of the bankruptcy system by denying [a] discharge to debtors who engage in objectionable conduct that is of a magnitude and effect broader and more pervasive than a fraud on a single creditor." *Giant Eagle, Inc. v. Monus (In re Monus)*, 167 Fed.Appx. 494, 496 (6th Cir.

2006). And the UST's role includes taking actions to vindicate the integrity of the bankruptcy system. *See Citicorp. N. Am., Inc. v. Finley (In re Washington Mfg. Co.)*, 123 B.R. 272, 275 (Bankr.M.D.Tenn.1991) ("The role of the United States Trustee was intended by Congress to relieve the bankruptcy judges of an administrative role and to function as bankruptcy watch-dogs to prevent fraud, dishonesty, and overreaching in the bankruptcy system.") (internal quotation marks omitted). That said, there are certain cases in which "the attempt to propel a request for revocation of discharge ... [is] a throwaway, unworthy of putting into suit and not deserving of much time and treatment." *Markey*, 378 B.R. at 614. The Court need not and does not decide whether, in light of the questionable filing of proofs of claim by Hardesty—and the numerous facts of this case that point to a lack of knowledge and fraudulent intent on the Debtors' part—bringing this adversary proceeding was an appropriate exercise of the UST's prosecutorial discretion.

and fraudulently fail to report or deliver any portion of the inheritance to Hardesty. "This decision was not made lightly, and nothing [in this opinion] should be interpreted as a willingness to allow a debtor to play[ ] ostrich and bury [ ] his head deeply enough in the sand [to] disclaim all responsibility." *Marcella*, 2009 WL 3348251 at *18 (internal quotation marks omitted). "Rather, on the unique circumstances of this case, th[e] Court concludes that the Debtors did not act with the intent required to revoke a discharge under § 727(d)(2)." *Id.*

### VI. Conclusion

For these reasons, the Court concludes that the UST is not entitled to judgment on the Complaint, but that judgment instead should be granted in favor of the Debtors. The Court will enter a separate judgment entry in accordance with this memorandum opinion.

**IT IS SO ORDERED.**